LEWIS AND ROCA LLP
LAWYERS

40 North Central Avenue, Suite 1900
Phoenix, Arizona 85004-4429

Stephen M. Bressler, State Bar No. 09032
Direct Dial: (602) 262-5376
Direct Fax: (602) 734-3742
Email: SBressler@LRLaw.com
Kathleen Kahn, State Bar No. 027350
Direct Dial: (602) 262-5792
Direct Fax: (602) 734-3910
Email: KKahn@LRLaw.com

Pepper Hamilton LLP
301 Carnegie Center, Suite 400
Princeton, New Jersey 08543

John F. Brenner, admitted *pro hac vice*
Direct Dial: (609) 951-4193
Direct Fax: (609) 452-1147
Email: BrennerJ@PepperLaw.com

Attorneys for Defendant Cephalon, Inc.

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| NICOLAI TAVILLA and DONNA TAVILLA, husband and wife, on behalf of themselves and their two minor daughters, K.T., A.T.; and BRITNY TAVILLA, on behalf of herself,<br><br>Plaintiffs,<br><br>vs.<br><br>CEPHALON, INC.;<br><br>Defendants. | No. CV11-00270-PHX-DGC<br><br>**DEFENDANT CEPHALON'S MOTION FOR SUMMARY JUDGMENT** |

Defendant Cephalon moves for summary judgment on Plaintiffs' claims because they are barred by the two-year limitations of actions found in A.R.S. § 12-542. This motion is made pursuant to Fed. R. Civ. P. 56 and is supported by an accompanying Statement of Facts and the following Memorandum of Points and Authorities.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. Introduction.

This is a product liability action. Plaintiff Nicolai Tavilla experienced significant pain following a series of auto accidents. *Defendant's Statement of Facts* ("DSOF") ¶ 1. His treating physician (Dr. Christopher Barnes, a pain management specialist) prescribed various pain medications, including (beginning on September 16, 2004,) the medication

Actiq® (and its generic version).[1] DSOF ¶ 3. Actiq, which was manufactured by defendant Cephalon, is a form of fentanyl, a Schedule II controlled substance.[2] DSOF ¶ 4. It is administered via a drug "matrix" on a handle inserted in the mouth, which provides for rapid absorption and pain relief.[3] DSOF ¶ 5. Actiq's FDA-approved warnings clearly identified a risk of dependence and of tooth decay. DSOF ¶ 6. Mr. Tavilla claims to have suffered both those effects by 2007. DSOF ¶¶ 14, 27, 28, 38. (Dr. Barnes kept prescribing Actiq into late 2008.[4] DSOF ¶ 9.) As this suit was filed more than two years later – on September 15, 2010, Cephalon moves for summary judgment based on the two-year statute of limitations found in A.R.S. § 12-542.

Plaintiffs recognize that the claims are facially barred and will invoke the "unsound mind" provision of A.R.S. § 12-502(A) to toll the statute.[5] The facts are legally insufficient to meet their heavy burden of proof. More than two years before filing the suit, Mr. Tavilla contacted Cephalon and requested compensation. He also initiated, participated in, and settled multiple lawsuits between 2004-2008. This included giving testimony under oath and signing legal documents. When it was to his advantage to hold himself as of sound mind in other litigation, he did so, and succeeded. Having held himself out as competent to litigate and benefit from the legal system, Mr. Tavilla is now judicially estopped from claiming he was of "unsound mind" during that period. The Tavillas have proffered two healthcare providers to assert (*ipse dixit*) that he was of unsound mind. The opinions fail to meet the requirements of Fed. R. Evid. 702 and are inadmissible. Cephalon has filed a separate motion to exclude their testimony. In any event, Mrs. Tavilla has never contended that she was of "unsound mind," and her claims

---

[1] For convenience, all references hereafter will be to Actiq, even though it may have been the generic drug.
[2] This category of drugs is considered to have strong potential for abuse or addiction but also to have legitimate medical use.
[3] The matrix is sometimes colloquially referred to as a "lollipop."
[4] Mr. Tavilla has filed a parallel lawsuit for medical malpractice against Dr. Barnes, as well as against Blue Cross Blue Shield of Arizona ("Blue Cross Blue Shield"), which provided insurance coverage for his pain medication (and which, according to Mr. Tavilla, should have taken steps to discontinue his use of Actiq).
[5] Plaintiffs have also indicated they will raise an equitable defense, but have not yet articulated it.

are time-barrred.

## II. The Tavillas Were Aware Of Their Claims More Than Two Years Before Filing This Lawsuit.

### A. The Applicable Statute of Limitations.

Actions for injury to the person, including product liability actions, must be commenced "within two years after the cause of action accrues." A.R.S. § 12-542; § 12-551. "As a general matter, a cause of action accrues, and the statute of limitations commences, when one party is able to sue another." *Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*, 182 Ariz. 586, 588, 898 P.2d 964, 968 (1995) (citation omitted). Here, the material facts are not disputed: no later than August 2007 – more than three years before filing suit – both Mr. and Mrs. Tavilla believed Mr. Tavilla's teeth had been damaged by Actiq and that he had become addicted to it. The Tavillas do not make a "discovery" argument. They cannot. As set forth in section II.B below, they knew "both the what and who elements" of their claims by 2007, and the statute began to run. *See Doe v. Roe*, 191 Ariz. 313, 323, 955 P.2d 951, 961 (1998). Indeed, Mr. Tavilla contacted Cephalon and requested compensation more than two years before filing this lawsuit.

### B. Facts Establishing the Tavillas' Knowledge of Their Causes of Action.

The facts reflecting Mr. and Mrs. Tavilla's knowledge and appreciation of their claims by 2007 are clear, uncontradicted and legion. According to discovery responses in their parallel action against Dr. Barnes, the Tavillas believed Mr. Tavilla was addicted and had teeth infections by 2005:

> Plaintiff was unable to have neck and back surgery beginning in 2005 as a result of his addiction to medications, weight gain and infections to teeth due to Dr. Barnes' excessive prescribing of medications and, in particular, Actiq.

DSOF ¶ 25. On February 13, 2006 (during the time he now claims to have been of unsound mind), Mr. Tavilla testified in a deposition that Actiq was "rotting" his teeth:

> I've taken Actiq lozenge. That's for quick acting when you're in real, real bad pain and you don't know what to do. It's very fast-acting



> morphine. As a matter of fact, it's rotting my teeth out to where that's a whole other issue there.

DSOF ¶ 27. Nowhere in that deposition did Mr. Tavilla or anyone on his behalf claim that he was incompetent. As discussed below, there is much more.

**1. Mr. Tavilla Contacts Cephalon Regarding His Injuries.**

Commencing in the spring of 2007, as he was undergoing procedures to address his tooth damage, Mr. Tavilla began to contact Cephalon seeking compensation. On April 17, 2007, Mr. Tavilla called a Cephalon-sponsored call center. As set forth in the record of that call:

> The purpose of this consumer's call was to request that Cephalon take care of his dental problems caused by ACTIQ. He then reported that he had experienced cavities, broken teeth, dental fillings that had fallen out, teeth that had fallen out or had to be pulled, and bone loss in his mouth. . . . He stated that he has been to see 3 dentists and is scheduled to see a fourth. He was told that he will have to be admitted to the hospital so that the rest of his teeth can be extracted, and so that the upper palate can be lowered so that bone grafts can be inserted. . . . Caller declined to provide further details until he is contacted by someone at Cephalon with authority to approve taking care of his dental problems.

DSOF ¶ 34. In response to Mr. Tavilla's request, Brian Hirsch, then an in-house attorney for Cephalon, called him back soon thereafter. DSOF ¶ 35. As reflected in Mr. Hirsch's notes of his telephone calls, DSOF ¶ 35a, he confirmed that Mr. Tavilla was not represented by counsel in the matter, and explained that if he were to retain an attorney, Mr. Hirsh would not be able to speak with him further. DSOF ¶ 35b. In that and subsequent calls between April and November 2007, Mr. Tavilla described his dental problems and demanded that Cephalon pay him "whatever's fair for what I've been through and what's done," including "reasonable pain and suffering" in exchange for a release of claims. DSOF ¶¶ 35-37. He also advised that he believed he was addicted to Actiq and he needed to go into rehabilitation to get off of it. DSOF ¶ 38a.

Mr. Tavilla offered to provide pharmacy, medical and dental records in support of his claims; Mr. Hirsch made clear that while he would consider any records submitted, his willingness to do so was not intended to constitute an agreement to make any payments to



Mr. Tavilla. DSOF ¶¶ 35g-h, 38c. Mr. Hirsch explained that he could not take any position on Mr. Tavilla's situation until he received such records; and cautioned that he would not address the claim in any way without those records. DSOF ¶ 38e.

Mr. Tavilla had four more telephone calls with Cephalon from May to November 2007. DSOF ¶ 36. He never forwarded any records, nor did he contact Cephalon thereafter. DSOF ¶ 38f.

**2. Mr. Tavilla Pursues Insurance Coverage From BCBS.**

In April 2007, Mr. Tavilla sought dental care with Dr. Steven Poulos. Dental records for Mr. Tavilla's April 29, 2007 visit reflect, "Patient reported injury to teeth due to deterioration from oral fentanyl." DSOF ¶ 41. In a letter dated June 11, 2007, Dr. Poulos wrote to Blue Cross Blue Shield in an effort to secure insurance coverage for Mr. Tavilla's dental problems:

> [Mr. Tavilla] has severe dental breakdown. He was in severe pain with acute and chronic infection. He needs extensive dental work. The decay is typical of that seen in individuals that use sugar-containing lozenges.

DSOF ¶ 43. Blue Cross Blue Shield denied Mr. Tavilla's request for coverage. DSOF ¶ 44. Mr. Tavilla then engaged in multiple telephone calls with Blue Cross Blue Shield as he appealed that denial (which conduct also bears directly on Mr. Tavilla's ability to manage his affairs — *see* below at III.B.2). DSOF ¶ 45. This culminated in an October 22, 2007 letter from Blue Cross Blue Shield to Mr. Tavilla setting forth the history of his claim, and proposing a compromise, noting:

> BCBSAZ fully understands your position that your current need for extensive dental repair is directly related to your longstanding use of oral fentanyl that you allege caused severe dental breakdown, including acute and chronic mouth infections.
>
> . . .
>
> [Y]our argument is that your teeth have deteriorated from your prolonged use of fentanyl lozenges.

DSOF ¶ 50.

**3. Dr. Barnes Tells Mr. Tavilla That Actiq Was Damaging His Teeth.**

Dr. Barnes' office notes during this time period similarly reflect Mr. Tavilla

understood and believed that Actiq was damaging his teeth:

| | |
|---|---|
| September 12, 2006 | "The patient understands that he has some problems with tooth abscesses and decay and is associated with the dry mouth affects [sic] of pain medication." DSOF ¶ 14a. |
| August 28, 2007 | "He understands that his decayed teeth were brought on by poor dental hygiene and the dry mouth and sugar affects [sic] of pill and lozenge medication." DSOF ¶ 14b. |

In addition, Dr. Barnes testified on behalf of Mr. Tavilla on December 12, 2007, in a lawsuit against OneBeacon Insurance Group that Mr. Tavilla was addicted to Actiq and it had caused tooth decay:

Q. And why is the Actiq – why is that something that you prefer that he would wean himself from?
A. It has contributed most to his tooth decay.

. . .

Q. Would you say that Mr. Tavilla is addicted to any of the medications that you have prescribed for him?
A. I would say that he is physically addicted to them.

DSOF ¶ 15 (objection omitted).

**4. Mr. Tavilla Tells His Internist That Actiq Was Damaging His Teeth.**

Mr. Tavilla was treated by internist Dr. Ira Ungar for various medical problems in 2007. DSOF ¶ 16. Dr. Ungar's office records reflect Mr. Tavilla's understanding that Actiq was damaging his teeth:

| | |
|---|---|
| June 25, 2007 | "He is very concerned that the medicine [he] is taking may be causing his teeth to rot out." DSOF ¶ 18a. |
| September 6, 2007 | "We also discussed that he needs a note for his insurance company stating that his dental decay was secondary to medications he was taking." DSOF ¶ 18b. |
| October 25, 2007 | "He was advised to get his teeth pulled because there's so much damage from the narcotics lollipops you is [sic] using." DSOF ¶ 18c. |
| November 12, 2007 | "We reviewed the mechanism of how his teeth got like that and it is from those narcotic lollipops." DSOF ¶ 18d. |

**5. Declaration and Deposition Testimony of Christine Grubb, Ph.D.**

Dr. Christine Grubb is a psychologist who interacted with Mr. and Mrs. Tavilla during the relevant time period. DSOF ¶ 19. At the request of the Tavillas' attorney (Mr. Treon), she executed a declaration on August 20, 2007, for the Tavillas' arbitration dispute with OneBeacon Insurance Group. DSOF ¶ 20. In the declaration, Dr. Grubb stated that Mr. Tavilla suffered from "mood disorder with mixed features due to a general medical condition," which "medical condition" included "jaw and gum disease from prescribed pain medications." DSOF ¶ 21. Dr. Grubb also diagnosed Mr. Tavilla as suffering from "polysubstance dependence" and noted that he "is currently physically and mentally dependent upon pain medications he has been prescribed." DSOF ¶ 22.

Dr. Grubb confirmed at her deposition in this case that, by the time she executed the August 2007 declaration, she had told Mr. and Mrs. Tavilla of her opinion that he was substance dependent:

> Q. Did you tell Mr. Tavilla that you believed he suffered from polysubstance dependence?
> A. Yes.
> Q. Did you tell Mrs. Tavilla that?
> A. Yes.
> Q. Did either of them disagree with you?
> A. No.
> Q. Did you share that view with Mr. and Mrs. Tavilla by August 2007?
> A. I'm sure I would have.

DSOF ¶ 23.

Dr. Grubb also confirmed that Mr. Tavilla told her in 2007 that Actiq was causing his jaw and gum disease:

> Q. How was it that you were aware that Mr. Tavilla had jaw and gum disease from prescribed pain medication?
> A. He told me about it.
> Q. What medications did he tell you had caused him to have gum and jaw disease?
> A. He – I'm not good at names. I take it something he took on a lollipop, and that was the main one. And he would actually be telling me about how his teeth were falling out or he was getting all sorts of decay, but he would not – could not stop sucking on those things.

DSOF ¶ 24.

Mr. Tavilla made this statement connecting Actiq to his dental decay despite his

alleged addiction to the product.

**6. Mr. Tavilla Testified In This Case That He Believed In 2007 That Actiq Had Caused His Teeth Problems.**

Mr. Tavilla's testimony in this lawsuit makes clear that he believed he had been injured by Actiq by 2007:

> Q. By the time you got to see Dr. Poulos in 2007, you thought Actiq was causing problems with your teeth, right?
> A. My belief, yeah.
> Q. Okay. Did you think that before you saw Dr. Poulos?
> A. Yes.
> Q. When did you first think Actiq was doing something wrong to your teeth?
> A. When I started, like . . . I think I told you earlier, when I put it in my mouth, I'd either put it to one side or other. So, like, mainly it would be this side, though. And the teeth were wearing on the side.... So you put two and two together, and that's what I – I mean, it didn't really take a whole lot of thinking.
>
> . . .
>
> Q. But is what you're telling me – tell me if I'm wrong – but is what you're telling me, you noticed that on the side of the mouth where you were using the Actiq, those teeth were being affected?
> A. Yes.
>
> . . .
>
> Q. Okay. You – you remember it started sometime before you saw Dr. Poulos?
> A. Yes.
> Q. In 2007?
> A. Yes, sir.

DSOF ¶ 28.

> Q. Was there a time, Mr. Tavilla, when you thought you were dependent on Actiq?
> A. There's no doubt I was.
> Q. When did you first think you were?
> A. Probably when my – my kids were saying, "please get off it. You know, please, Dad, please." My wife begging me. My daughter begging me. I would say I was pretty dependent then.
> Q. And your wife told us she remembered and said it was . . . one of your daughters' birthday in September 2008 when she wanted her birthday present for you to be — to stop the medication. Do you remember that?
> A. Yeah.[6]

DSOF ¶ 31 (objection/colloquy omitted).

[6] Mr. Tavilla's daughter's birthday was September 5, 2008. *See* subsection II.B.7.



**7. Mrs. Tavilla Confirmed That By 2007 They Believed Actiq Injured Mr. Tavilla.**

Mrs. Tavilla testified:

Q. Was one of the dentists your husband went to see to deal with the tooth problem Dr. Poulos?
A. Yeah, Dr. Poulos.

. . .

Q. Did you attend any of your husband's visits with Dr. Poulos?
A. Yes.
Q. Did you go to the first one?
A. Yes.
Q. That was in April 2007?
A. Okay.

. . .

Q. When you – you and your husband met with Dr. Poulos, did he talk about the fact that he thought Actiq or pain medications were . . . hurting your husband's teeth?
A. Actiq, that's the first time I had understood that's what caused it.
Q. And when you say "the first time," that was your first meeting with Dr. Poulos?
A. And my first recollection that this was Actiq doing it.
Q. Okay. That was something Dr. Poulos told you and your husband?
A. Right.

DSOF ¶ 29.

Q. Did there come a time when you felt that your husband was addicted to Actiq?
A. Absolutely.
Q. By 2005?
A. Within few months after beginning it, I'm sure.

DSOF ¶ 26 (objection omitted).

Q. Why did they go back to New York?
A. My husband was trying to kick the Actiq, and we were having battles and struggles and all kinds of stuff, and he had promised Britny. That's all she asked for for her birthday, was for him to get off Actiq.
Q. When was her birthday – when is her birthday?
A. September 5th.
Q. And Britny asked as a birthday present for him to get off Actiq?
A. Uh-huh.
Q. You have to answer verbally.
A. Yes. I'm sorry.
Q. Okay. That was her birthday, in – September 5th, 2008, right?
A. Right.
Q. So it would be fair to say that by September 5th, 2008, your family believed your husband was too dependent on Actiq.
A. Sure. I hated seeing those little sticks sticking out of his face.

DSOF ¶ 30.

## III. Mr. Tavilla's Claims Are Time-Barred.

Plaintiffs do not claim that Mr. Tavilla was unaware that he was addicted to Actiq

or that that Actiq damaged his teeth. As demonstrated above, they cannot. Rather, they claim that he was of unsound mind and therefore the statute is tolled.

**A. Mr. Tavilla Is Judicially Estopped From Claiming He Was Of "Unsound Mind".**

Although Mr. Tavilla claims he was of unsound mind throughout 2004-2008, this did not prevent him from initiating, participating in and benefiting from at least four other lawsuits litigated in Arizona Superior Court during that time period.[7] At no time, did either he or his attorney assert that he was of unsound mind.

(1) *Tavilla v. Endocrinology Associates* (CV2007-003451): On February 24, 2005, Mr. Tavilla fell off an examination table at Dr. Chandana Mishra's office and was injured. DSOF ¶ 55. He retained Mr. Treon, who filed a lawsuit on February 23, 2007. DSOF ¶ 56. He signed legal authorizations releasing his medical records, DSOF ¶ 73, and gave a four hour and forty-five minute deposition on January 24, 2008. DSOF ¶ 57. Mr. Tavilla eventually settled the case and entered into a binding settlement agreement in January 2010. DSOF ¶ 59.

(2) *Tavilla v. OneBeacon Insurance Group* (CV2003-004203): While driving his employer's car, Mr. Tavilla was rear-ended by two successive vehicles. DSOF ¶ 60. After settling with the adverse drivers, he made an underinsured motorist claim against his employer's automobile policy with Colorado Casualty Co., which later merged into OneBeacon Insurance Company. *Id.* It had UIM limits of $1 million. *Id.* The parties proceeded to arbitration as required by the insurance policy. DSOF ¶ 61. Mr. Tavilla was deposed on February 13, 2006. DSOF ¶ 62. In January 2008, Mr. Tavilla settled the case for $925,000. DSOF ¶ 64.

(3) *Tavilla v. City of Phoenix* (CV2002-018960): The Tavillas filed two lawsuits against the City of Phoenix in 2002. In this lawsuit, the Tavillas alleged that a Phoenix police officer sexually harassed Mrs. Tavilla and caused the Tavillas to lose their contract with the City providing repair work to the police department's undercover vehicles and allowing the Tavillas to bid on seized vehicles and to provide vehicles to the City.

---

[7] Mr. Tavilla has been involved in at least 26 lawsuits, 20 as a plaintiff. DSOF ¶ 53.

DSOF ¶ 67. While this occurred before Mr. Tavilla was on Actiq, he was on other narcotic medication. *Id*. Still, he was of sound mind to retain counsel and authorize a lawsuit. Even though he was later dismissed from the case, Mr. Tavilla was deposed on May 17, 2005, *id*., and on October 16, 2009, DSOF ¶ 68. Mr. and Mrs. Tavilla testified at trial. DSOF ¶ 69. In none of these proceedings did Mr. Tavilla or anyone on his behalf ever claim that he lacked the mental capacity to manage his affairs or understand his legal rights.

(4) *Tavilla v. City of Phoenix* (CV2002-005915): Mr. and Mrs. Tavilla brought the first lawsuit on March 29, 2002, alleging that Phoenix police officers illegally searched and detained their three children for several hours outside the presence of their parents. DSOF ¶ 66. During the course of the litigation, Mr. and Mrs. Tavilla withdrew their claims and only proceeded on behalf of their three children. *Id.* With counsel, they mediated the lawsuit on February 22, 2005. *Id.* They settled the case for $60,000 ($20,000 for each child). *Id.* They signed a one page statement that accurately set forth the terms of the settlement. *Id.* Thereafter, the City sent a full settlement agreement for Mr. and Mrs. Tavilla to execute. *Id.* This agreement called for the Tavillas to release all of their claims against the City, including Mrs. Tavilla's claim for sexual harassment (*see* no. 3 above). *Id.* The Tavillas refused to sign the agreement. *Id.* Within the last year, the Tavillas filed another lawsuit against the City to enforce the settlement agreement that had been reached. *Id.* They did not allege that Mr. Tavilla was of unsound mind and the agreement should be reformed. Rather, they alleged that Mrs. Tavilla and he were the *guardian* ad *litem* for their children and settled the case on behalf of the children. *Id.* They alleged the City breached the agreement and asked the court to enforce it. *Id.*

Judicial estoppel is an equitable doctrine that "precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." *Rissetto v. Plumbers & Steam Fitters Local 343*, 94 F.3d 597, 600 (9th Cir. 1996). Having held himself out as of sound mind to bring lawsuits, testify and otherwise participate in the legal proceedings and resolve with binding effect, Mr. Tavilla is now judicially estopped from claiming he was not of sound mind to bring this lawsuit.

Federal law governs the application of judicial estoppel in federal court. *Id.* The Ninth Circuit has enumerated various factors in determining whether to apply the doctrine:

- whether the party's position is clearly inconsistent with its earlier position
- whether the party successfully advanced the earlier position
- whether the party asserting an inconsistent position derives an unfair advantage or imposes an unfair detriment in doing so

*Samson v. NAMA Holdings, LLC*, 637 F.3d 915, 935 (9th Cir. 2011).

The purpose of judicial estoppel is to protect the integrity of the judicial process. *Whaley v. Belleque*, 520 F.3d 997, 1002 (9th Cir. 2008). In applying the doctrine, "the interested party is … the court." *Id.* Where, as here, a litigant routinely and consistently holds himself out as fully capable and competent to file suit (both on his own behalf and as a guardian for his children); to give deposition testimony; to conclude litigation by accepting settlements, and signing settlement agreements (on behalf of himself and as guardian), he should not be allowed, years later, to claim that he was legally incapable of performing those acts.

Arizona law recognizes a general presumption that a witness is competent to testify and an incompetent cannot bring a legal proceeding on his own behalf. *Golleher v. Horton*, 148 Ariz. 537, 541, 715 P.2d 1225, 1229 (App. 1985); *Kiley v. Jennings, Strauss & Salmon*, 187 Ariz. 136, 140, 927 P.2d 796, 800 (App. 1996). By litigating these actions in his own name, Mr. Tavilla established his capacity to pursue his legal rights because "[a]n incompetent cannot bring or defend a legal proceeding in person." *Kiley*, 187 Ariz. at 140, 927 P.2d at 800. Judicial estoppel should be applied to preclude Mr. Tavilla from now claiming that he was of "unsound mind" during the very years he initiated, prosecuted and settled[8] other personal litigation. Now, in order to evade the statute of limitations, he takes the contrary position, to advantage himself and disadvantage defendant.

**B. Mr. Tavilla Cannot Properly Invoke The "Unsound Mind" Provisions Of A.R.S. § 12-502(A).**

Even if he is not judicially estopped from asserting that he was of unsound mind,

---

[8] Accepting a settlement of a workers' compensation claim has been held by the Ninth Circuit to constitute "succeeding" on one's claim. *Rissetto*, 94 F.3d at 604-05.

Mr. Tavilla cannot legally meet the high burden of proof he faces.

A.R.S. § 12-502(A) provides that if a person entitled to bring an action "is at the time the cause of action accrues … of unsound mind, the period of such disability shall not be deemed a portion of the period limited for commencement of the action." The standard is quite strict; otherwise, every litigant could allege unsound mind to circumvent summary judgment on a statute of limitations defense. "In Arizona, unsound mind occurs when the 'person is unable to manage his affairs or to understand his legal rights or liabilities.'" *Doe*, 191 Ariz. at 326, 955 P.2d at 964 (quoting *Allen v. Powell's Int'l*, 21 Ariz. App. 269, 270, 518 P.2d 588, 589 (1974)). The burden of proof is on plaintiff, who "must set forth specific facts – hard evidence – supporting the conclusion of unsound mind." *Id.* As the Arizona Supreme Court has explained, the "purpose of unsound mind tolling is to protect persons who are without access to courts and unable to participate in, control, or understand progression of suit." *Id.* Mr. Tavilla does not and cannot meet that standard.

Throughout most of his adult life, Mr. Tavilla has been a plaintiff to numerous lawsuits (generally represented by Mr. Treon). *See* DSOF ¶ 53. Between 2004 and 2008, the putative period of his "unsound mind," Mr. Tavilla demonstrated a complete ability to gain "access to courts" and to "participate in, control, or understand progression of suit." He: (a) initiated one personal injury lawsuit (DSOF ¶¶ 55-59), gave lengthy depositions in at least three of his pending actions (DSOF ¶¶ 58, 62, 67), entered into agreements to settle at least two lawsuits (on his own behalf and as guardian for his children) (DSOF ¶¶ 59, 64), and executed other legal instruments (DSOF ¶ 78); (b) sought insurance coverage for treatment of his Actiq-related dental problem, including pursuing administrative appeals with Blue Cross Blue Shield and, when that failed, directing his attorney to file suit (DSOF ¶¶ 40-52); and (c) sought compensation directly from Cephalon for his claims of addiction and tooth damage (DSOF ¶¶ 33-38). This is discussed in more detail in the following subsections.

**1. Participation in Litigation, 2004-2008.**

During the time period in question, Mr. Tavilla brought litigation, participated in

litigation (including lawsuits filed before 2004) and settled cases without appointment of a guardian. To the contrary, he and his wife have prosecuted (and settled) an action as guardians for their minor daughters during the relevant period.

Although purportedly of "unsound mind" throughout the entirety of 2004-2008, Mr. Tavilla actively participated in litigation during that time. Mr. Tavilla gave three lengthy depositions: on May 17, 2005 in *Tavilla v. City of Phoenix* (conducted between 1:43 p.m. and 4:40 p.m.); on February 13, 2006 in *Tavilla v. OneBeacon Ins. Group* (conducted between 9:44 a.m. and 3:59 p.m.); and on January 24, 2008 in *Tavilla v. Endocrinology Associates* (conducted between 10:00 a.m. and 3:15 p.m.). DSOF ¶¶ 58, 62, 67. Mr. Treon, his attorney in all three matters, raised no objection to his client's competence to testify, and Mr. Tavilla gave coherent, responsive replies to the questions put to him. DSOF ¶ 72. In two of those depositions, he spoke specifically about his use of Actiq. In his 2006 deposition, he testified that Actiq was "rotting" his teeth and in his January 2008 deposition, he testified that he was reducing the amount of Actiq he was using. DSOF ¶¶ 27, 58.

After sustaining injury on February 24, 2005, at a doctor's office (DSOF ¶ 55), through Mr. Treon, Mr. Tavilla filed a lawsuit on February 23, 2007 (DSOF ¶ 56), within one day of the statute of limitations; gave a deposition in that matter on January 24, 2008 (DSOF ¶ 57); and ultimately settled the claim (DSOF ¶ 59).

In February 2005, Mr. Tavilla attended a mediation and executed a Settlement Agreement with respect to claims brought on behalf of his daughters against the City of Phoenix. DSOF ¶ 66. In 2008, he settled the *OneBeacon* case for $925,000. DSOF ¶ 64. In 2006, Mr. Tavilla executed a Deed of Trust to secure a promissory note given to his attorney – Mr. Treon – in the amount of $180,000. DSOF ¶ 78.

**2. Mr. Tavilla's Pursuit of Claims Against Blue Cross Blue Shield.**

By April 2007, Mr. Tavilla was undergoing dental procedures to treat the damage to his teeth and gums he believed had been caused by Actiq. DSOF ¶¶ 40-41. Records produced by Blue Cross Blue Shield in parallel litigation reflect that Mr. Tavilla —



personally, and later through counsel — made repeated efforts to secure coverage for his Actiq-related dental claims:

- June 11, 2007: Letter submitted by Mr. Tavilla's dentist attributes his tooth damage to use of Actiq. DSOF ¶ 43.
- June 25, 2007: Mr. Tavilla calls Blue Cross Blue Shield to inquire about his claim. DSOF ¶ 45.
- August 23, 2007: Mr. Tavilla requests a "level one grievance" review regarding his claim for services provided by Dr. Poulos. DSOF ¶ 46.
- August 31, 2007: Blue Cross Blue Shield writes to Mr. Tavilla advising that his grievance has been rejected, and that he has a right to further review. DSOF ¶ 47.
- September 21, 2007: Blue Cross Blue Shield writes to Mr. Tavilla to advise that it had conducted a level two formal appeal, but continued in its determination that he was not entitled to dental benefits. DSOF ¶ 49.
- October 22, 2007: Blue Cross Blue Shield writes Mr. Tavilla explaining, again, that his claim for Actiq-related "severe dental breakdown" was denied, but that they would be willing to compromise and provide certain limited coverage. DSOF ¶ 50.

Unsatisfied with this response, Mr. Tavilla sought the assistance of his attorney, Mr. Treon. Mr. Treon's file reflects that, by August 26, 2008, he had contacted Blue Cross Blue Shield on Mr. Tavilla's behalf and attempted to secure coverage. DSOF ¶ 51. Still unable to resolve the matter, Mr. Treon instituted suit — within the statute of limitations — against Blue Cross Blue Shield on August 4, 2009. DSOF ¶ 52.

Mr. Tavilla's pursuit of Blue Cross Blue Shield demonstrates how capable he was of managing his affairs and pursuing his legal rights with respect to Actiq – the very product at issue in this case — in 2007 and early 2008. He actively pursued treatment for what he believed were Actiq-related injuries and submitted a claim for coverage for that treatment. When that failed, he availed himself of at least two levels of administrative review. He spoke with Blue Cross Blue Shield representatives, advising that he would retain an attorney and pursue legal action if his claim was not satisfactorily resolved. When the claim was not resolved to his satisfaction, he did, in fact, get Mr. Treon involved and, ultimately, brought suit — unlike this case — <u>within</u> the statute of limitations.

**3. Mr. Tavilla's Communications with Cephalon.**

Mr. Tavilla also sought compensation directly from Cephalon. DSOF ¶¶ 33-38. In

2007, Mr. Tavilla possessed the mental acuity and wherewithal to (a) secure the identity of Actiq's manufacturer, Cephalon; (b) locate a telephone number for Cephalon's medical information call center; (c) contact the call center; and (d) thereafter engage in repeated telephone calls with Cephalon representatives in an effort to secure compensation. *See* subsection II.B.1.

A recent case from this district illustrates how Mr. Tavilla's claim of unsound mind is legally insufficient. In *Cecala v. Newman*, 532 F. Supp. 2d 1118 (D. Ariz. 2007), plaintiff asserted claims against her former lawyer for legal malpractice and for intentional infliction of emotional distress arising out of a personal and sexual relationship she developed with him. Plaintiff did not commence her action until some five years after the relationship with her attorney ended, claiming the benefit of "unsound mind" tolling. The *Cecala* court, after surveying relevant Arizona law, and reviewing the proofs before it — including expert opinion proffered by plaintiff — rejected her assertion of "unsound mind," and granted defendant's summary judgment motion.

The *Cecala* court placed great weight on plaintiff's ability to pursue, and engage in, litigation at the time she claimed to be of "unsound mind." Quoting from the concurrence in *Doe*, the court explained that "the best guide to whether somebody can understand and pursue his legal rights is how that person behaves, not what that person says he or she cannot do." *Id.* at 1144 (*citing Doe*, 191 Ariz. at 332, 955 P.2d at 970). The court noted that plaintiff had "repeatedly and conclusively demonstrated not only that she was <u>aware</u> [of her intentional tort claim], but also that she was able to 'articulate events so as to <u>pursue</u> her rights….'" *Id.* at 1146 (emphasis added). In particular, the court pointed out that plaintiff had searched for, and discussed her claims with counsel and — having failed to secure new counsel — prosecuted certain of her claims on her own:

> The uncontroverted evidence adduced by [plaintiff] demonstrates not only recognition of her legal rights, but the pursuit of those rights throughout the claimed period of disability.
>
> . . .
>
> [Plaintiff] was not only able to care for herself at least <u>some</u> of the time, but [ ] she also had the higher degree of mental ability required to research and pursue her legal rights… for the entirety of the claimed



period of functional disability.

*Id.* at 1147 (emphasis in original). As the court observed:

> [Plaintiff's] own evidence shows at the relevant times she actually did the ultimate thing the unsound mind exception aims to prove she could not do: pursue litigation. . . . She now asks the court to allow a jury to find that she could not do the very thing she was doing. This defiance of plain facts and plain meaning would make foolery of the unsound mind exception.

*Id.* at 1152-53.

These same determinations should apply here. Throughout the period in question, Mr. Tavilla pursued litigation of all types — including litigation arising out of his claim that Actiq injured him — the very thing he now claims he was unable to do. His pursuit of insurance coverage for his dental problems from Blue Cross Blue Shield, culminating in a suit filed within the statute of limitations, prove he could "do the very thing" he wants to convince a jury he could not do.

#### 4. The Expert Testimony Proferred In Support Of Mr. Tavilla's Claim Of "Unsound Mind" Does Not Meet Fed. R. Evid. 702 Requirements, And Is Inadmissible.

In support of his claim that he was of "unsound mind" between 2004-2008, Mr. Tavilla has proferred the opinions of a psychologist, Dr. Grubb, and a physician, Dr. Sucher. Their opinions do not meet Rule 702 requirements, and Cephalon has contemporaneously moved to exclude their opinions. *See* Defendant's Motion to Exclude Opinions of Michel Sucher, M.D. and Christine Grubb, Ph.D. (Dkt. 42).

## IV. Mrs. Tavilla's Claims Are Time-Barred.

Plaintiffs do not claim that Mrs. Tavilla was of "unsound mind." As she believed, no later than 2007, that her husband was addicted to Actiq and that his use of this medication had damaged his teeth (DSOF ¶ 25-26, 29), any claims she may have against Cephalon are time-barred. *Dugan v. Fujitsu Business Communications Systems, Inc.*, 188 Ariz. 516, 521, 937 P.2d 706, 712 (App. 1997).

## V. Conclusion.

The Court should enter summary judgment against the Tavillas because their claims are time-barred.

RESPECTFULLY SUBMITTED December 16, 2011.

LEWIS AND ROCA LLP

By /s/ *Stephen M. Bressler*
Stephen M. Bressler
Kathleen Kahn

PEPPER HAMILTON LLP

By /s/ *John F. Brenner*
John F. Brenner

*Attorneys for Defendant Cephalon*

**CERTIFICATE OF SERVICE**

I certify that on December 16, 2011, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing.

I further certify that on December 16, 2011, I served the attached document by U.S. mail to:

Richard T. Treon
Treon, Aguirre, Newman & Norris
2700 North Central Avenue
Suite 1400
Phoenix, AZ 85004
*Attorneys for Plaintiffs*

*Theresa Beltran*