Richard T. Treon (No. 002064)
**TREON, AGUIRRE, NEWMAN & NORRIS**
A Professional Association of Lawyers
2700 N. Central Avenue, Suite 1400
Phoenix, Arizona  85004-1133
Telephone (602) 285-4400
Fax (602) 285-4483
Direct e-mail: rtt@treonfirm.com
Firm e-mail:  treonfirm@treonfirm.com

Attorneys for  Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| NICOLAI TAVILLA and DONNA TAVILLA, husband and wife, on behalf of themselves and their two minor daughters, KATHERINE TAVILLA and ALYSSA TAVILLA, and BRITNY TAVILLA, on behalf of herself,<br><br>Plaintiffs,<br><br>v.<br><br>CEPHALON, INC., a Delaware corporation; JOHN DOES and JANE DOES 1-10; BLACK CORPORATIONS I-X; WHITE CORPORATIONS I-X; and XYZ PARTNERSHIPS I-X;<br><br>Defendants. | NO. CV11-00270-PHX-DGC<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANT CEPHALON'S MOTION FOR SUMMARY JUDGMENT** |

I.    **INTRODUCTION – REBUTTAL**

Mr. Tavilla was prescribed Actiq the last time "in late 2008." (Mo., p. 2, li. 7.)  In fact, Mr. Tavilla did not take the last Actiq until the Spring of 2009.  (PSOFE, Ex. EE, ¶19.)[1]

This action was filed on September 15, 2010 not "more than two more years" after Plaintiff stopped taking Actiq (Mo., p. 2, li. 8), but well within two years after Mr. Tavilla last

---

[1] Plaintiffs' Statement of Fact Establishing a Genuine Issue of Material Fact [hereinafter PSOFE, Ex. ___, ¶ ___].

ingested Actiq.  Therefore, "Plaintiffs [do not] recognize that the claims are facially barred . . . ."  (*Id*. at li. 10.)  In fact, the claims are facially timely filed.

      Defendant has raised the contention that "more than two years before filing this suit, Mr. Tavilla contacted Cephalon and requested compensation."  (*Id*. at li. 12-13.) At that time (2007), Nick Tavilla was, under the law, of "unsound mind" (A.R.S. §12-502).  Also, Defendant knew facts resulting in it being equitably estopped (and/or the doctrine of equitable tolling applies) from alleging that the statute of limitations began to run on Mr. Tavilla's claim then.  Alternatively, Plaintiff contends that Defendant committed a fraud on him [hereafter we will refer to Nicola Tavilla as Plaintiff and Donna Tavilla by name] from April through November 2007 when he was communicating with Defendant's representatives, and particularly Brian Hirsch, an attorney for Cephalon assigned to negotiate customers' compensation claims.  Mr. Hirsch had three conversations with Mr. Tavilla during 2007: (4/17 or 18; 5/11; 11/2).  (PSOFE, ¶¶ 58, *et seq*., Ex. H-1 - 4.)  Further, he failed to provide Mr. Tavilla with critically important evidence regarding facts known to Cephalon and Mr. Hirsch at that time regarding the fact that their product was dangerous and defective and was almost certainly causing injury to Mr. Tavilla, and that Cephalon had committed a fraud on Mr. Tavilla.  That is, both Mr. Hirsch and the Cephalon Medical Services call taker learned facts from Mr. Tavilla that should have put them on notice that Mr. Tavilla was not a cancer patient, the only class of patients for whom this drug was to be prescribed.  Defendant's agents failed to follow the law in declaring Mr. Tavilla's use of Actiq as both an "adverse event" (damage to teeth and addiction) and because of off-label use – use of Actiq by a non-cancer patient so follow-up care could be provided.  Cephalon was required to report this information to both the FDA and to Mr. Tavilla's treating

physician, Dr. Christopher Barnes. They did neither.[2] Mr. Hirsch failed to inform Mr. Tavilla of critically important information regarding Actiq and, most importantly, when he learned that Mr. Tavilla was addicted to Actiq and that he needed to go into rehabilitation to "get off of it," Mr. Hirsch failed to advise Mr. Tavilla that he needed to discuss these matters with his own attorney. (PSOFE, Ex. DD, ¶16.)

II. **THE TAVILLAS' CAUSES OF ACTION DID NOT ACCRUE UNTIL WITHIN TWO YEARS PRIOR TO THE FILING OF THE LAWSUIT**

Defendant inaccurately cites *Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of*

---

[2]The FDA limited the prescription of Actiq to patients who had cancer and who had tried every other opioid but nonetheless still had "breakthrough cancer pain." Mr. Tavilla never had cancer and Mr. Hirsch and the Cephalon Medical Call Center's call taker knew or should have known this based on their conversations with Mr. Tavilla. Defendant's fraud bars it from relying on the statute of limitations relating to the communications that occurred in 2007 and provides the basis for a new cause of action for fraud on behalf of Plaintiffs. Under A.R.S. § 12-543(B), "a cause of action shall not be deemed to have accrued until the discovery . . . of the facts constituting the fraud" and there is a three-year statute. Plaintiffs did not discover Defendant's fraud until they received the Declaration of attorney Brian Hirsch when Defendant filed its Motion for Summary Judgment on September 2, 2011 (Document 40) (PSOFE, Ex. DD, ¶¶ 14-21), and thereafter Cephalon's records relating to Mr. Tavilla's calls in 2007.

With regard to the claims of Plaintiff Donna Tavilla, she did not know about her husband's telephone conversations with Mr. Hirsch and the matters that were stated between them until after September 2, 2011 when she was provided with a copy of Mr. Hirsch's Declaration and the notes regarding the telephone calls. (PSOFE, Ex. EE, ¶¶ 16-18.) Her claim for loss of consortium was timely filed on September 15, 2010, well within two years from the date that her husband last took Actiq. While Mrs. Tavilla may have known in 2007 that her husband's teeth were being damaged by Actiq, that fact alone does not establish that she knew her husband had a cause of action against Cephalon for which she would have a claim for loss of consortium. Moreover, Mrs. Tavilla's claim is primarily based upon the fact that her husband became addicted to Actiq and this had a dramatic impact on her and her family's life and her relationship with her husband.

Defendants claim that Mrs. Tavilla should have filed her action independently of her husband's alleged disability within two years of November 2007 because she knew he was "addicted" to Actiq. (See Mo., p. 17.) Addiction is a medical term of art. (See PSOFE, ¶50.) Although she believed he was physically addicted early on after he started using Actiq, she did not discover facts establishing Actiq had chemically addicting properties and that in fact her husband had been psychologically addicted to Actiq until within two years prior to the date the lawsuit was filed. (PSOFE, Ex. EE, ¶¶ 17, 19.) A fact question is presented whether Mrs. Tavilla, as a lay person, knew her husband was psychologically addicted to Actiq in 2007, or when she knew this.

3

*Am.*, 182 Ariz. 586, 591, 898 P.2d 964 (1995). (Mo., p. 3.) The question in *Gust* was whether the discovery rule would be applied in contract actions. The Court held it was. The complete cite includes the Court's statement that "the point is not when the last act upon which legal action is based took place . . . ." to determine when the statute begins. Rather: "Under the 'discovery rule' a plaintiff's cause of action does not accrue until the plaintiff knows or, in the exercise of reasonable diligence, should know the facts underlying the cause." (182 Ariz. at 588.) Plaintiffs claims are subject to the two year statute. (A.R.S. §12-542.) Plaintiffs contend Defendant's product was defective and unreasonably dangerous, Defendant failed to warn Plaintiff of this, and it caused Mr. Tavilla's teeth to be damaged and for him to be physically and psychologically addicted to it, both of which injuries continued through the Spring of 2009 while he was continuing to take the Actiq.

Thus, even if Defendant's arguments regarding Plaintiff's telephone calls in 2007 are well taken barring Plaintiffs' claims, Defendant's contentions only bar those claims which accrued prior to two years before the lawsuit was filed. Plaintiff filed the lawsuit on September 15, 2010. All civil wrongs committed by Defendant and damage caused from September 15, 2008 until September 15, 2010 are not subject to the statute of limitations defense. Plaintiffs aver Mr. Tavilla's teeth were being damaged and he was suffering from addiction to Actiq through the time he finally stopped using Actiq in the Spring of 2009 and when he became detoxified in late Spring of 2009. Thus, at a minimum, all of Plaintiffs' claims for the period September 15, 2008 through late Spring to 2008 are timely.[3]

---

[3] As to Mrs. Tavilla, there is no evidence that she had any conversation with her husband or anyone from Cephalon regarding what Mr. Tavilla was saying to Mr. Hirsch and what Mr. Hirsch was saying to him. Therefore, her right to make a claim for her loss of consortium damages regarding her husband being addicted to the Actiq extends back to the point in time when Plaintiffs can prove the addiction began (prior to 2007), assuming that her husband can establish a tolling in 2007, and for his addiction after September 15, 2008. Assuming, *arguendo*, that she did know that the Actiq was causing his teeth to rot in 2007, her claim for this damage, unless subject to an estoppel or fraud tolling, would be barred for any damages up until those accruing after September 15, 2008, two years before the lawsuit was filed.

We contend the statute of limitation was tolled prior to and during the entire time Mr. Tavilla was talking to Mr. Hirsch, extending until the late Spring of 2009 when he finally was able to become detoxified from the physiological and psychological effects of the drug.

### III. <u>CONTROLLING ARIZONA LAW</u>

####  A. <u>Mr. Tavilla Was Of Unsound Mind Up Until the Late Spring of 2009.</u>

   1. <u>Law</u>.  *Doe v. Roe*, 191 Ariz. 313, 323, 955 P.2d 951 (1998), (Mo., p. 3) is the controlling Arizona case on the question of accrual of a cause of action based upon a claim of unsound mind.

> "The statutory provision for tolling based on unsound mind is premised on equitable principles similar to those that underlie the discovery rule:  it is unfair to bar an action in which the plaintiff is mentally disabled and thus unable to appreciate or pursue his or her legal rights. . . .  Tolling statutes based on mental incompetency are enacted to relieve from the strict time restrictions people 'who are unable to protect their legal rights because of an overall inability to function in society.'" (*Id*. at 325-26.) . . .

> "While the purpose of the discovery rule and the tolling provisions for unsound mind are essentially similar, their applications are critically distinct.  The discovery rule contains an informational component requiring that the fact finder determine when the plaintiff knew or should have known the <u>facts</u> that constituted a cause of action.  Tolling for unsound mind, on the other hand, requires that the fact finder determine whether the plaintiff had the <u>mental capacity to bring a claim based on those facts</u>.  Thus, taken together, the discovery rule and the tolling provision for unsound mind delay the running of the statute of limitations requiring that the plaintiff both know of the underlying facts and be mentally capable of bringing a claim." (*Id*. at 326.) (Emphasis added.)

The Court then noted that "unsound mind is evaluated by <u>both</u> one's ability to manage his affairs <u>and</u> his ability to comprehend legal rights or liabilities." (*Doe, supra,* at 328.)  In order to invoke the unsound mind tolling provision, the plaintiff must "set forth specific facts - - hard evidence - - supporting the conclusion of unsound mind" (191 Ariz. at 326):

> "Thus, the proper factual inquiry for whether the Plaintiff was of unsound mind focuses on her mental condition at and after the time for accrual . . . .  Therefore, in conjunction with the discovery rule, it is for the jury to (1) discern when the cause of action accrued and (2) determine whether, at that time, and thereafter, Plaintiff was of unsound mind." (*Id*. at 330.)

### 2. Facts Establishing Inability to Manage Affairs And/Or to Know His Legal Rights And Liabilities.

Mrs. Tavilla testifies that her husband was of unsound mind during the time period he was on Actiq beginning at some unknown point before 2007 when the combination of the Actiq and the other opioids he took made him incapable of managing his daily affairs or to understand his legal rights or liabilities and she sets forth "hard evidence" to support that statement. (PSOFE, Ex. EE.) She could not, however, petition to have him civilly committed because to do so would result, in her opinion, in either her husband committing suicide or taking physical actions toward her or undersigned counsel. She states that her husband was paranoid about this subject and constantly persevered on the issue, that she was terrified of his temper and what he might do if she tried to have him civilly committed, or if she tried to place him under a guardianship or conservatorship or both. (PSOFE, Ex. EE, ¶6.) It was not until Spring of 2009 that he was able to wean himself off of the Actiq and late Spring before he detoxed. (*Id*. at ¶19.) (See also PSOFE, Exs. AA-FF in their entirety; Ex. AA, ¶31; BB, ¶¶ 17-19.)

### B. Defendant Is Equitably Estopped from Invoking the Statute of Limitations Based Upon Its Communications with Mr. Tavilla in 2007.

Arizona has recognized equitable estoppel as tolling the statute of limitations. *Pritchard v. State*, 162 Ariz. 427, 432, 788 P.2d 1178, 1183 (1990). It applies if:

> (1) the party to be estopped intentionally or negligently induces another to believe certain material facts, (2) the induced party takes actions in reliance on the reasonable belief of those facts and (3) the induced party is injured by so relying. *Pueblo Santa Fe Townhomes Owners Ass'n v. Transcon Ins. Co.*, 218 Ariz. 13, 21, ¶30, 178 P.3d 485, 493 (App. 208).

Plaintiffs contend Defendant either negligently or intentionally failed to tell Plaintiff in any of the three telephone conversations Mr. Hirsch had with him in 2007 that he should not be taking Actiq because he was not a person who had cancer (PSOFE, ¶¶ 58-231; Exs. H-1 - H-4, Hirsch depo.; EXHIBITS TO FACTS ESTABLISHED BY B. HIRSCH'S DEPOSITION). These call records establish that Cephalon acted contrary to FDA rules in

failing to report Mr. Tavilla's call as an "Adverse Event" under the law; and Mr. Hirsch failed to tell Mr. Tavilla that Cephalon had received numerous complaints from other customers alleging that Actiq was causing their teeth to be damaged.  Mr. Tavilla called and spoke to a person in the Medical Services Department of Cephalon.  That person, in accordance with company policy and FDA requirements, took down extensive information regarding Mr. Tavilla's medical condition establishing he was suffering an adverse event as defined by the FDA as a result of the use of Actiq.  (*Id*., PSOFE, Ex. H-1, B. Hirsch depo.) Instead of having one of its representatives contact Dr. Barnes, Mr. Tavilla's prescribing physician, and inform him that Mr. Tavilla should not be taking the Actiq because he was not a cancer patient with a follow-up report to the FDA, the Medical Services call taker, who also was supposed to provide for safety oversight in regard to any calls, referred the call to Mr. Hirsch.  (*Id*.)  He was the "Associate Director of Litigation for Cephalon." (*Id*. at ¶2.) The call apparently was forwarded because Mr. Tavilla was seeking compensation from Cephalon to have his teeth fixed.  Mr. Hirsch did not tell Mr. Tavilla anything regarding the fact the drug was only for cancer patients, or that Actiq was known to Cephalon to cause damage to at least 36 customers' teeth as of April of 2007, or that Actiq was known to cause addiction.  (PSOFE, Ex. DD, ¶¶ 7, 9, 10, 12, 13.)  Instead, he negotiated with Mr. Tavilla over a 6½ month period resulting in no report to Dr. Barnes and no report of Mr. Tavilla's case to the FDA.  (PSOFE, Ex. H-1 - H-4, B. Hirsch Depo.)  By choosing to switch Mr. Tavilla to the Legal Department from the Medical Services Department (where his medical needs were required to be met as a matter of law under FDA standards), Cephalon could attempt to negotiate its way out of what the facts demonstrate Mr. Hirsch knew had to be a meritorious claim by Mr. Tavilla.  In addition, Cephalon claims it was thereby able to avoid telling Mr. Tavilla the truth about the damage the product was doing to his teeth and that he was being prescribed a medication that was considered "off label" and not appropriate for him to use.  A trier of fact could find, this conduct inequitable, if not fraudulent.  Whether

viewed as an intentional or negligent failure to tell Mr. Tavilla the whole truth, the first requirement to establish equitable estoppel has been met.  With regard to the second requirement, Mr. Tavilla dealt with Mr. Hirsch over a 6½-month period, all the while continuing to ingest Actiq and, at the end of the process, received no recompense or validation or disclosure of the true facts regarding the drug that he was taking or, indeed, any follow-up at all.  As a result, Mr. Tavilla continued to take the drug until late Spring of 2009 (PSOFE, Ex. DD, ¶7; Ex. EE, ¶19) to his damage; requirement number three is easily met because Plaintiff alleges that his teeth continued to rot and that he continued to suffer the effects of addiction over the next almost two years, which had terrible consequences for him and his family (*Id*. at Ex. D).  Moreover, Defendant's actions caused Plaintiff to continue to suffer from mental impairment which prevented him from understanding what happened to him or what his legal remedies might be.  The statute of limitations will not bar an action when the defendant's negligent or intentional acts cause the plaintiff to suffer a mental impairment.  *Ulibarri v. Gerstenberger*, 178 Ariz. 151, 158, 871 P.2d 698 (App. 1993).  Plaintiffs have offered sufficient proof to create a genuine issue of material fact on the issue of whether the statute of limitations should be equitably tolled as the result of Defendant's negligent or intentional actions.

    **C.**    **Fraud.**

Arizona law has long supported the principle that a party's actual or constructive fraud will toll the statute.  *Tom Reed v. Mining Co.*, 39 Ariz. 533, 537, 8 P.2d 449 (1932):

> Courts of equity, however, early began to apply a different rule in cases where the defendant had by its fraudulent conduct concealed from the plaintiff the existence of the facts which gave rise to the cause of action, and held that under such circumstances the statute did not begin to run until after the plaintiff knew, or reasonably should have known, the existence of such facts . . . .  In law as well as in equity a defendant who, by his conduct, has prevented a plaintiff from knowing the existence of the facts on which an action is based, is estopped from setting up as against such plaintiff the bar of the statute of limitations until after the plaintiff knows, or reasonably should have known, the existence of such facts . . .

> Actual fraud . . . may be described as: when a party intentionally or by design, misrepresents a material fact or produces a false impression in order to mislead another or to entrap or cheat him, or to obtain undue advantage over him, in every such case there is a positive fraud, in the truest sense of the terms.  (*Id*. at 540).

The Court further held constructive fraud also applies to toll the statute, the difference being that in constructive fraud, there is no intent on the part of the actor to induce another to part with property or surrender some legal right. (*Id*.) *Ulibarri, supra,* holds that where the defendant conceals a cause of action - - there by means of mental impairment due to hypnosis - - a statute is tolled because "it would be inequitable to hold persons under such disabilities to strict time limitations for filing legitimate claims." 178 Ariz. at 159.  Here, Defendant, acting through its agents in the Medical Service Department and Mr. Hirsch, failed to advise Plaintiff Nick Tavilla of the fact that the medication he was taking was not manufactured or sold for his use as a non-cancer patient and that the off label use was supposed to be reported to Dr. Barnes (to stop it) and the FDA. (PSOFE, Ex. DD, ¶9.)  Therefore, Defendant failed to tell him the truth and deprived Plaintiff of the information that he needed regarding the fact he had a cause of action both for the damage to his teeth and for his addiction.  Further, the failure to tell him the truth caused him to continue to be damaged for the next two years (April, 2007 to the late Spring of 2009). Further, Defendant failed to inform Plaintiff of material facts necessary for him to have knowledge of and to make informed decisions regarding Actiq and Cephalon's fraudulent activities toward him.  (PSOFE, ¶¶ 1-58; Ex. DD, ¶¶ 12-22.)  As such, Defendant is barred from raising the statute of limitations defense, because of actual or constructive fraud.

**D. Equitable Tolling.**

Alternatively, equitable tolling should be applied.  It applies when the plaintiff is excusably ignorant of the limitations period and the defendant would not be prejudiced by the late filing. *Kyles v. Contractors/Engineers Supply*, 191 Ariz. 403, 405, 949 P.2d 63 (App. 1997).  "Equitable tolling does not require the plaintiff to show any misconduct on the

9

defendant's part." (*Id*.)  Here, Defendant was fully informed by its own admission (and contention) of Plaintiff's claims by November 2, 2007.  Thus no prejudice can be claimed.

Under the doctrine of equitable tolling, a plaintiff may sue after the statutory time period for filing a complaint has expired if he had been prevented from filing "due to sufficiently inequitable circumstances." *McCloud v. State of Arizona*, 217 Ariz. 82, 87, 170 P.3d 691 (App. 2007).  "Courts have applied equitable tolling when 'extraordinary circumstances beyond plaintiff's control made it impossible to file the claims on time.'"  Ninth Circuit law is consonant with Arizona law on the issue of equitable tolling: "Extraordinary circumstances beyond Plaintiffs' control made it impossible to file the claims on time." (*Alvarez-Machain v. United States*, 107 F.3d 696, 701 (9th Cir. 1996)

**IV.  PLAINTIFFS ARE NOT "JUDICIALLY ESTOPPED."  THE FOUR CASES CITED PROVIDE NO FACTUAL BASIS FOR ESTOPPEL.**

First, if the Court agrees that Plaintiffs have established a triable issue of fact on the unsound mind, estoppel or fraud issues, then manifestly Defendant's judicial estoppel argument fails as a matter of law.  Defendant's factual contentions under this heading become facts Defendant would offer proof as proof to establish Mr. Tavilla wasn't of unsound mind or that Defendant did not act inequitably, or commit fraud.

**1.  Tavilla v. Endocrinology.**  Plaintiff had nothing to do with any aspect of the processing of this slip and fall case. (PSOFE, Ex. BB, ¶14.)  The facts were communicated by Mr. Tavilla to undersigned counsel's paralegal within days after February 24, 2005 and incorporated by counsel in the Complaint filed on February 23, 2007 without any involvement of Plaintiff.  This injury occurred early on in the time period Plaintiff was using Actiq (started in late September of 2004) and the trier of fact could find that he was not yet so addicted to the medication at that point in time he could not remember and repeat the simple facts surrounding this accident.  The later signing of a medical records release form put in front of him by a paralegal, or even the ability to respond to questions in a deposition

do not prove Mr. Tavilla was of sound mind. (PSOFE, Ex. AA, ¶¶ 40-42; Ex. BB.)[4]

      **2. Tavilla v. OneBeacon.** This lawsuit was first filed in 2001, refiled in 2003. Mr. Tavilla had nothing to do with processing the case. (PSOFE, Ex. BB, ¶¶ 9, 16, 21.) The fact he was able to answer questions at a deposition proves nothing regarding his then being of sound mind, particularly given the amount of medications that he was taking on the day of his deposition. (PSOFE, Ex. BB, ¶¶ 16, 21.) Mr. Tavilla was unable to testify at the arbitration hearing (held in January of 2008) because of his physical and mental disabilities. (Ex. BB, ¶21.) The case was settled and the settlement papers were signed and the money distributed only because Mrs. Tavilla assumed responsibility to do whatever she thought was appropriate regarding settlement because he was not competent to make such a decision and basically defaulted on making the decision. (*Id*.)

      **3. Tavilla v. City of Phoenix (CV2002-005915) (so-called "motel invasion" case).** Defendant is wrong on the facts. No such settlement occurred. In fact, the inference available to the trier of fact is that on February 22, 2005 Mr. Tavilla "executed a [purported] Settlement Agreement to resolve this action for $60,000" (DSOF, ¶66), and thereby acted incompetently because he signed a document that contained information that was inaccurate and which caused the purported settlement to be disavowed. (PSOFE, Ex. BB, ¶¶ 12, 15.) That settlement still has not been completed.

      **4. Tavilla v. City of Phoenix (CV2002-018960) (sexual harassment of Mrs. Tavilla).** The May 17, 2005, deposition was given early after Plaintiff began taking Actiq and the fact he was able to respond to questions in a deposition has no relevancy for his being of sound mind if in fact he was addicted, at least physically addicted, as Plaintiff

---

    [4]See Opinion of addictionologist Dr. Michel Sucher, demonstrating that people who have serious drug addictions that are affecting their mental processes are still able to carry on apparently rational actions. (PSOFE, Ex. AA, ¶¶ 40-42.) As is further evidenced from the Declaration of counsel, Mr. Tavilla did what his lawyer told him to do in signing the release document and accepted $25,000.00 because he was financially destitute and could not provide for his family without receiving these funds. (PSOFE, Ex. BB, ¶ 14.)

11

claims, to the Actiq at that point in time. In addition, there is no evidence Mr. Tavilla's teeth were affected by the Actiq in May of 2005. Mr. Tavilla was no longer a Plaintiff in the sexual harassment case after his causes of action were dismissed in 2003, long before he was taking Actiq. (PSOFE, Ex. BB, ¶ 13.) The fact Plaintiff "gave deposition testimony on October 16, 2009" is irrelevant since Plaintiff does not contend he was addicted to or under the influence of Actiq at that time (having "de-toxed" by the late Spring of 2009).[5]

Judicial estoppel is an equitable doctrine and Defendants have acted inequitably (and fraudulently) toward Plaintiff and therefore should not be allowed to invoke it. In any event, Defendant cannot meet its legal burden of showing that Plaintiff acted inappropriately such that the doctrine should be applied.

Defendant contends that "having held himself out as of sound mind to bring lawsuits, testify and otherwise participate in the legal proceedings and resolve with binding effect, Mr. Tavilla is now judicially estopped from claiming he was not of sound mind to bring this lawsuit . . . ." (Mo., pp. 10-11.) The only lawsuit brought during the time period that Mr. Tavilla was taking Actiq was the Endocrinology Associates slip and fall case, which was filed on February 23, 2007 and not settled until January 2010, long after Mr. Tavilla was free from the effects of the Actiq addiction. (PSOFE, Ex. BB, ¶14.) Defendant repeats throughout its Motion almost as a mantra that Plaintiffs claim Mr. Tavilla was of unsound mind between 2004-2008. Plaintiff has not specified a time period within that "defense-alleged-time-frame" when Plaintiff first became addicted in the legal sense to the Actiq. Defendant has seized upon the fact Plaintiff began taking Actiq on September 17, 2004, and

---

[5]That deposition was given within 11 months prior to the filing of this lawsuit on September 15, 2010. Therefore it is probative of nothing regarding Plaintiff's mental state prior to September 15, 2008, the date prior to which the issue of unsound mind has to be examined because none of the events that occurred within 2 years prior to September 15, 2010 are subject to the statute of limitations. While it is true that the jury awarded $600,000 to Mrs. Tavilla, it is not true that "the jury found for the Tavillas" because Mr. Tavilla was no longer a Plaintiff. (PCSF, ¶56.) (PSOFE, Ex. BB, ¶13.)

the fact that Dr. Barnes last prescription was written on November 18, 2008, and has turned those dates into an alleged allegation by the Plaintiff that he was of unsound mind during this entire time period because he was physically and psychologically addicted to Actiq. This ignores that there is no medical evidence regarding the precise point in time when Mr. Tavilla became psychologically addicted to the Actiq as opposed to being physically addicted.  All Plaintiffs can prove in this regard are the prescriptions written, filled and taken (PSOFE, Ex. AA, Attachment 4) for chart containing dates and dosages of all medications prescribed by Dr. Barnes provided by Plaintiff); nor does Defendant's analysis take into consideration that Plaintiff was taking several other opiates that were additive to the addicting and mind-altering effects of Actiq.[6]

Defendant claims that because of Plaintiff's alleged involvement in the four cases cited that to allow him to claim that he was of unsound mind during some time period prior to September 15, 2008 would somehow undermine the "integrity of the judicial process." The first factor cited, that Mr. Tavilla "routinely and consistently holds himself out as fully capable and competent to file suit (both on his own behalf and as the guardian for his children)" (Mo., p. 11) is manifestly unsupported by the record.  Mr. Tavilla had nothing to do with the filing of the *Endocrinology Associates* case.  He sat for one deposition in January of 2008.  However, the deposition transcript demonstrates that Mr. Tavilla was on

---

[6] See Declaration of Dr. Michel Sucher, (PSOFE, Ex. AA, ¶¶ 40-42), explaining that a person who was taking the amount and type of medication that Mr. Tavilla was taking during the time period in question could have moments of lucidity even while generally addicted and appear to be able to manage his affairs or understand his legal rights when overall the individual is certainly not competent in either of these respects.

In addition, Mrs. Tavilla avers that her husband always denied he was psychologically addicted to Actiq, although admitting he was physically addicted.  She believed he was physically addicted from early on after he started taking Actiq but did not become aware he was psychologically addicted until the late Spring of 2009, when all of his other medications remained the same but he changed.  "Within several months after he stopped taking [Actiq], his mind cleared . . . and he seemed like a new man." (PSOFE, Ex. EE, ¶19.)

13

heavy doses of narcotic medication. (PSOFE, Ex. AA, ¶42.)[7] Next, Mr. Tavilla did not "conclude litigation by accepting settlements, and signing settlement agreements (on behalf of himself and as guardian) . . . ." (Mo., p. 11.) As demonstrated, the alleged signing of a settlement for his children was a legal nullity and demonstrates Mr. Tavilla's confusion and incompetency on February 22, 2005. (PSOFE, Ex. BB, ¶15.) With regard to the OneBeacon settlement, the record demonstrates Mr. Tavilla did not actively participate in the arbitration proceeding and he only signed the release at the direction of his wife who forced him to sign it precisely because he was not mentally competent to continue to refuse to sign the document that she placed in front of him. (PSOFE, Ex. BB, ¶¶ 16, 21.)

*Kiley v. Jennings, Strauss & Salmon*, 187 Ariz. 136, 140, 427 P.2d 796 (1996)

---

[7]He sat for two depositions early in the time period of using the Actiq which Defendant argues demonstrates that he was of sound mind but which does not prove that he was not of unsound mind on other days and in particular after February 16, 2006 through September 15, 2008. See *Doe v. Roe*, 191 Ariz. 313 at 327. See also *Golleher v. Horton*, 148 Ariz. 537, 541, 715 P.2d 1225, 1229 (App. 1995). The question in *Golleher*, *supra*, was whether a decedent had had the mental capacity to sign a general power of attorney in favor of his sister. The Court held that:

> "In order to invalidate an instrument, mental incompetency must exist at the time of the execution of the instrument . . . In Arizona there is a presumption of competency which continues despite a subsequent period of incompetency since such persons may have lucid intervals." (148 Ariz. at 541.) (Emphasis added.)

Defendants have offered no evidence that Mr. Tavilla was not having moments of a "lucid interval" when he answered questions at his deposition on May 17, 2005 or February 16, 2006, or indeed on January 28, 2008.

Moreover, there was no "fraud" or taking of an unfair advantage against OneBeacon by Mr. Tavilla signing that document. Defendant wanted the case settled for the $925,000. It did not want to have to pay its $1 million policy limits. Mr. Tavilla's claim in that case related to a L-5, S-1 herniated disc that he received on March 26, 1996, almost 12 years before the settlement. To the extent Defendant impliedly argues that Plaintiff's counsel was incompetent in not having his client declared to be legally incompetent so that a release could be signed by his guardian and conservator, that would be a matter between Mr. Tavilla and his counsel and, at least in theory, between OneBeacon and undersigned counsel if Mr. Tavilla (or his representative) had ever sought to disavow that settlement. None of that has occurred and Defendant is simply trying to take advantage of the fortuitous as to it fact that, during the time that Mr. Tavilla was addicted to Actiq, he signed a settlement agreement in litigation totally unrelated to Cephalon. Defendant's position is an inequitable position and a misuse of the doctrine of judicial estoppel.

14

supports Plaintiffs' position, holding that "the tolling statute [for unsound mind] is applicable despite the fact of the appointment of a conservator . . ." (187 Ariz. at 140). Thus even had we had a conservator appointed for Mr. Tavilla prior to his signing the *OneBeacon* settlement document (or the deed of trust [PCSOF, ¶78]), this would not in any way affect the Court's analysis of the unsound mind tolling contention. What Defendant is really arguing is that although Plaintiff could have argued for unsound mind had he had a conservator appointed, because he did not he is barred from making the unsound mind claim because somehow the fact of the settlement would constitute a fraud on this Court (or the Court in the *OneBeacon* case). This is a curious and inequitable argument. It is curious because Defendant was not a party to that action and, indeed, based upon the facts in evidence, Defendant's drug Actiq seriously affected Mr. Tavilla's ability to participate in the OneBeacon arbitration hearing (and probably cost him and his wife $75,000!). (See PSOFE, Ex. BB, ¶21.) Moreover, had actions been taken to try to have a conservator appointed for Mr. Tavilla it could have resulted in either physical injury to Plaintiff's counsel or possibly suicide by Mr. Tavilla, neither of which were desirable results.[8] Applying the factors used in determining whether to apply the doctrine of judicial estoppel under *Samson v. NAMA Holdings, LLC.*, 637 F.3d 915, 935 (9th Cir. 2011), Defendant cannot meet its burden of establishing the applicability of this principle in this case.

V.  **OTHER CONTENTIONS**

With regard to Defendant's claim that Mr. Tavilla was involved in other litigation prior to 2004 (Mo., p. 10, n. 7), this fact is irrelevant. Moreover, Plaintiff in each case was genuinely the victim of the wrongful conduct of another and in each case (except one which

---

[8] In light of the these facts of record, it is unfair for Defendant to contend that because undersigned counsel did not raise objection to Mr. Tavilla giving a deposition because he was of "unsound mind" (DSOF ¶72), this should somehow be held against Mr. Tavilla. Such an action on undersigned counsel's part, given Mr. Tavilla's pathology, could have resulted in dire consequences to all concerned.

15

is ongoing) he was successful. (See PSOFE, Ex. BB, *passim*.) Mr. Tavilla did not "give lengthy depositions" as alleged by Defendant. He was required to sit as a party for depositions in the Endocrinology Associates case, the OneBeacon case and as a non-party witness in the City of Phoenix sexual harassment case. With regard to the deposition times listed by Defendant at page 13, li. 16-20, none of these times include the time spent for lunch break or for other breaks during the course of the depositions and thus present a misleading picture of the length of the depositions. Nor do they consider Plaintiff's medication regimen or the fact a person can have lucid periods even though of unsound mind. (PSOFE, Ex. AA, ¶¶ 40-42.)

Defendant's statement that "Mr. Tavilla gave coherent, responsive replies to the questions put to him, citing DSOF, ¶ 71, does not support the allegation made by the referenced statement. On the contrary, Mr. Tavilla's testimony during these depositions was at times rambling, totally unresponsive and evidenced a person who was on exceedingly high doses of medication having issues with pain, understanding of the questions asked and of the process. The fact that Mr. Tavilla testified "in two of those depositions that the Actiq was rotting his teeth" proves nothing except that Mr. Tavilla was aware that the constant placement of a sugary substance against one's teeth over time could cause them to rot.

With regard to Defendant's contentions regarding Mr. Tavilla's interaction with Blue Cross Blue Shield, we have set forth the actual facts regarding these matters at PCSF, ¶¶ 40-54, PSOFE, Ex. BB, ¶ 26. Bottom line, Plaintiff made telephone calls to BCBS (again without his lawyer's knowledge) trying to get coverage under his medical care policy for dental coverage that is excluded on the face of the policy. (See Ex. AA, ¶ 43, explaining pathology; the contact with Dr. Dietrich's staff is similarly explainable. (*Id*.) In addition, it was precisely during the time period Mr. Tavilla was dealing with the BCBS representative (April 2007 through November 2007) that Plaintiff was dealing with Cephalon's legal counsel Brian Hirsch. Defendant should be estopped from trying to use against Plaintiff his

efforts to get (facially excluded) insurance coverage to get his teeth fixed which had been damaged by Defendant's product at the very same time that Defendant was denying Plaintiff those benefits while apparently setting, unknown to Mr. Tavilla, a statute of limitations trap for him to be used against him at a later time if he ever did sue Cephalon.

The case of *Cecala v. Newman*, 532 F. Supp. 2d 1118 (D. Ariz. 2007) actually supports Plaintiff's position.  As the Court noted: "A litigant need not be institutionalized nor be judged legally incompetent to qualify for tolling under A.R.S. §12-502."  (532 F.Supp.2d at 1145.)  There the plaintiff acted as her own lawyer throughout the entirety of the legal and administrative proceedings.  Here, Mr. Tavilla was represented by undersigned counsel, who has sworn that during at least during the time period 2006-early 2009 Mr. Tavilla was not competent to manage his own affairs and certainly not able to understand his legal rights or liabilities.  (PSOFE, Ex. BB, ¶¶ 17-19.)  Counsel has further testified that he acted as a "*de facto* guardian" of Mr. Tavilla during these time periods because of his continued representation of Mrs. Tavilla and the children and because of his continuing ethical obligation to protect his and Mr. Tavilla's rights.  (PSOFE, Ex. BB, ¶ 22, I.)

RESPECTFULLY SUBMITTED this 18th day of January, 2012.

**TREON, AGUIRRE, NEWMAN & NORRIS, P.A.**

By  */s/ Richard T. Treon*
    Richard T. Treon
    2700 N. Central Avenue, Suite 1400
    Phoenix, Arizona 85004-1133
    Attorneys for Plaintiffs

E-FILED this 18th day of January, 2012,
with the Clerk of the United States District Court
using the CM/ECF System for filing and
transmittal of a Notice of Electronic Filing
to the following ECF participants:

Stephen M. Bressler
Kathleen Kahn
Lewis and Roca, LLP
40 N. Central Avenue, 19th Floor
Phoenix, AZ 85004-4429
and
John F. Brenner
Pepper Hamilton, LLP
301 Carnegie Center, Suite 400
Princeton, NJ 08543
*Attorneys for Defendant Cephalon, Inc.*
SBressler@lrlaw.com
Kkahn@lrlaw.com
brennerj@pepperlaw.com


By  */s/ DeeAnn Haniman*
        DeeAnn Haniman