**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Nicolai Tavilla, et al., | No. CV-11-00270-PHX-DGC |
| Plaintiffs, | **ORDER** |
| v. | |
| Cephalon, Inc., a Delaware Corporation, | |
| Defendant. | |

Defendant Cephalon, Inc. ("Cephalon") filed a motion for summary judgment in this product liability suit on the basis that Plaintiffs' claims are time barred by the two year statute of limitations found in A.R.S. § 12-542. Doc. 75. The motion has been fully briefed, and neither party has requested oral argument. Docs. 78, 81. Plaintiffs also filed a motion to strike Defendants' additional statement of facts in support of its reply (Doc. 84) and a motion to file an amended complaint adding causes of action for fraud (Doc. 85). These motions have been fully briefed. Docs. 86, 88; 87, 90.[1] For the reasons set forth below, the Court will grant Cephalon's motion as to Donna and Britny Tavilla and deny it as to Nicolai Tavilla and the Tavilla's minor children. The Court will deny Plaintiffs' motion to strike and motion to amend.

---

[1] The parties' requests for oral argument are denied because the issues have been fully briefed and oral argument will not aid the Court's decision.  *See* Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

## I.    Background.

Beginning in September 2003, Plaintiff Nicolai Tavilla sought treatment from Dr. Christopher Barnes for chronic pain following a series of auto accidents.  Doc. 76, ¶ 1.  Dr. Barnes refilled Plaintiff's then-current prescriptions for Oxycontin, Percocet, and Valium, and on September 16, 2004, began prescribing Actiq, a drug manufactured, sold, and distributed by Cephalon.  *Id.*, ¶¶ 2-5.  Actiq is a drug "matrix" of fentanyl citrate – a controlled substance – that is administered through a lozenge on a stick, or "lollipop," for fast absorption and pain relief.  *Id.*, ¶ 5, Doc. 79, ¶ 5.  FDA-approved labels for Actiq state that it is an opiate indicated only to relieve breakthrough pain for cancer patients already tolerant of opioid therapy.  Doc. 79, ¶ 6.  The warnings also state that Actiq is a controlled substance that can lead to dependence and abuse as well as tooth and gum decay.  Docs. 76, ¶ 6; 79, ¶ 6.

Dr. Barnes prescribed Actiq for Plaintiff in varying dosages until November of 2008.  Docs. 76, ¶ 9; 79 ¶ 9.  Plaintiff told Dr. Barnes in 2006 and 2007 that he was having problems with abscesses and tooth decay.  79, ¶ 14; 76, ¶ 14.  Plaintiff began seeing dentist Dr. Steven Poulos for dental issues in 2007.  Docs. 76, ¶¶ 11-12; 79, ¶¶ 11-12.  On June 11, 2007, Dr. Poulos wrote to Plaintiff's insurance provider, Blue Cross Blue Shield ("BCBS"), that Plaintiff had "severe dental breakdown," that he was in "severe pain with acute and chronic infection," and that he needed "extensive dental work."  Docs. 76, ¶ 48; 79, ¶ 48.  Plaintiff was also treated by medical internist Dr. Ungar for dental and mouth-related problems, and Dr. Ungar advised Plaintiff on October 25, 2007, that he would have to get his teeth pulled because of extensive damage caused by the "narcotic lollipops" he was using.  Docs. 79, ¶ 17; 76, ¶ 17.

On April 17, 2007, Mr. Tavilla called Cephalon seeking compensation for his Actiq-related dental issues.   Doc. 76, ¶¶ 33-34.   Mr. Tavilla made additional calls between May and September of 2007, including to Cephalon in-house counsel Brian Hirsch, in which Mr. Tavilla requested payment for his dental treatment and pain and suffering, and agreed to send medical records to support his claim.  *Id.*, ¶¶ 36-38.

On May 1, 2007, Mr. Tavilla also contacted BCBS seeking insurance coverage for dental work done by Dr. Poulos as well as anticipated costs associated with his treatment plan. Docs. 76, ¶ 42; 79, ¶ 42. Following multiple reviews (*id.*, ¶¶ 48-50), BCBS proposed a compromise offering limited coverage. *Id.*, ¶ 50. On August 4, 2009, the Tavillas initiated a lawsuit against BCBS. *Id.*, ¶ 52.

On September 15, 2010, Plaintiffs filed a complaint against Cephalon in Maricopa County Superior Court alleging product liability and tort claims associated with Mr. Tavilla's addiction to Actiq – an addiction that Plaintiffs claim caused physical injury to him and loss of consortium for his wife and daughters. Doc. 1-5. Plaintiffs Nicolai and Donna Tavilla sued on behalf of themselves and their two minor daughters, and their daughter Britny sued on behalf of herself. *Id.* On February 9, 2011, Cephalon timely removed the case to this Court on the basis of diversity jurisdiction. Doc. 1. The Court ordered the parties to conduct discovery related to Cephalon's statute of limitations defense and Plaintiffs' argument that the statute was tolled because Mr. Tavilla was not competent to file suit. Doc. 17. Discovery on that issue closed on December 9, 2011, and Cephalon filed the instant motion on December 16, 2011.

## II.   Summary Judgment Standard.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

////

III.   **Discussion.**

A.   **Whether Plaintiffs' Claims are Time-barred.**

Under Arizona law, personal injury actions, including product liability actions, must be "commenced and prosecuted within two years after the cause of action accrues." *See* Ariz. Rev. S. § 12-542, *held unconstitutional for wrongful death actions by Anson v. Am. Motors Corp.*, 155 Ariz. 420, 426 (Ariz. 1987); § 12-551, *held unconstitutional in part on other grounds by Hazine v. Montgomery Elevator Co.*, 176 Ariz. 340, 342 (Ariz. 1983). Generally, "a cause of action accrues, and the statute of limitations commences, when one party is able to sue another." *Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*, 182 Ariz. 586, 588 (Ariz. 1995). "Under the 'discovery rule,' a plaintiff's cause of action does not accrue until the plaintiff knows or, in the exercise of reasonable diligence, should know the facts underlying the cause." *Id.*

Cephalon argues that Plaintiffs knew by 2007 that Mr. Tavilla had become addicted to Actiq and that it was damaging his teeth. Cephalon argues that the two-year statute of limitations began to run at that time, making Plaintiffs' September 15, 2010 complaint untimely. Doc. 75 at 3-9.

Plaintiffs respond that their claims are not time-barred because even though Mr. Tavilla's prescription ended in late 2008, he continued taking Actiq through the spring of 2009 and Plaintiffs filed the complaint within two years of that time. Doc. 78 at 1-2. Plaintiffs also argue that even if their claims for injuries that took place prior to September 15, 2008 are time-barred, damages caused from September 15, 2008 until September 15, 2010, when they filed the complaint, are not time-barred. *Id.* at 4.

The Court finds that Plaintiffs have raised a genuine issue of fact about when Mr. Tavilla last took Actiq. Cephalon states that Dr. Barnes prescribed Actiq for Mr. Tavilla until late 2008. Docs. 75 at 2, 76, ¶ 9. Plaintiffs argue on the basis of Donna Tavilla's declaration that although Dr. Barnes stopped prescribing Actiq for Mr. Tavilla in November 2008, Donna Tavilla had saved up Mr. Tavilla's partially used lozenges in plastic bags he continued to use throughout the spring of 2009 and remained addicted

1    until late spring of 2009.  Docs. 79 at 1-2, 80-7, ¶ 19.

2        This dispute is not material, however, because Arizona law provides that the

3    statute of limitations begins to run in tort actions from the time the injury is known.  In

4    *Gust*, the Arizona Court of Appeals recognized that Arizona courts have long applied the

5    "discovery rule" to tort cases, including in a 1948 medical malpractice case in which the

6    Arizona Supreme Court held that the statute of limitations did not begin to run "until the

7    plaintiff had discovered the facts constituting the cause of action."   898 P.2d at 967

8    (citing *Morrison v. Acton*, 198 P.2d 590, 596 (Ariz. 1948)).   Stated elsewhere, "the

9    plaintiff must at least possess a minimum requisite of knowledge sufficient to identify

10   that a wrong occurred and caused injury."  *Doe v. Roe*, 955 P.2d 951 (Ariz. 1998) (citing,

11   e.g., *Lawhon v. L.B.J. Institutional Supply, Inc.*, 765 P.2d 1003, 1007 (Ariz. Ct. App.

12   1988) (the plaintiff must know the what and who elements of the injury)).  As shown in

13   the legal malpractice context, once "some injury" or "damaging effect" is known, the

14   statute commences to run even where the extent of damages is unknown or the claimant

15   sustains further injury from the same cause of action.  *Cecala v. Newman*, 532 F. Supp.

16   2d 1118, 1142 (D. Ariz. 2007) (citing *Union Ins. Co. v. Lewis and Roca*, 902 P.2d 1354,

17   1359 (Ariz. Ct. App. 1995)); *see also Arizona Mgmt. Corp. v. Kallof*, 688 P.2d 710, 714

18   (Ariz. Ct. App. 1984) ("The cause of action arises . . . before the client sustains all, or

19   even the greater part, of the damages occasioned by his attorney's negligence.").

20       Plaintiffs have not presented a genuine issue of material fact over whether Mr.

21   Tavilla's addiction to and injuries from Actiq were known to them more than two years

22   prior to filing suit.  In answer to an interrogatory in a separate lawsuit against Dr. Barnes,

23   the Tavillas stated that beginning in 2005 Mr. Tavilla was unable to have neck and back

24   surgeries "as a result of his addiction to medications, weight gain and infections to teeth

25   due to . . . excessive prescribing of medications and, in particular, Actiq."  Docs. 75 at 3;

26   76, ¶ 25, admitted in Doc. 79, ¶ 25. Also, in a February 2006 deposition for an unrelated

27   lawsuit, Mr. Tavilla stated in answer to a question about his use of medications:  "I've

28   taken Actiq lozenge.  That's for quick acting when you are in real, real bad pain and you

don't know what to do.  It's very fast-acting morphine.  As a matter of fact, it's rotting my teeth out to where that's a whole other issue there."  Docs. 75 at 3; 76, ¶ 27, admitted with additional excerpt in Doc. 79, ¶ 27.  Mr. Tavilla also contacted Cephalon on April 17, 2007, seeking compensation for "cavities, broken teeth, dental fillings that had fallen out or had to be pulled, and bone loss in his mouth."  Docs. 76, ¶¶ 33-34.  He stated that he had been to three dentists and was told that he would have to be admitted to the hospital to have his teeth extracted and his upper palate lowered so that bone grafts could be inserted.  *Id.* [2]  Near the same time, Mr. Tavilla made a claim for dental coverage with BCBS that was denied in a letter dated October 22, 2007, stating that BCBS "understands your position that your current need for extensive dental repair is directly related to your longstanding use of oral fentanyl that you allege caused severe dental breakdown,

_____

[2] Plaintiffs make blanket objections to all of Cephalon's statements of fact regarding the substance of Mr. Tavilla's calls to Cephalon on the basis that Cephalon's call center notes lack foundation and that notes from Cephalon counsel Brian Hirsch and paralegal Roseanne Bennet constitute incompetent evidence.  Doc. 79, ¶¶ 33-38.  Objections of "foundation" and "incompetent evidence" are not found in the Federal Rules of Evidence, and Plaintiffs fail to identify any rule-based ground for their objections.  The objection to the call center notes appears to rest on the fact that Cephalon has not produced contracts or agreements showing that the call center was maintained by Cephalon, that Cephalon uses two call centers, and that the documents do not say which one took the calls.  *Id.*, ¶ 33.  This "foundation" objection presumably asserts that the notes cannot be properly authenticated under Rule 901, but Rule 901(a) requires only that evidence be sufficient to support a finding that the matter in question is what its proponent claims.  Plaintiffs do not explain why this requirement cannot be satisfied in this case by testimony of a witness with knowledge or by showing that the notes bear distinguishing characteristics.  The Court therefore cannot conclude that the notes will be inadmissible at trial.  To the extent Plaintiffs intend to assert a hearsay objection, they fail to show that Defendants cannot satisfy the business record exception.  *See* Fed. R. Ev. 803(6).  With respect to the notes of Mr. Hirsch and Ms. Bennet, Plaintiffs appear to object because the notes contain references to Mr. Tavilla's contact with other call-takers without a record of what was said in those other conversations, and one entry by Mr. Hirsch references a conversation between Ms. Bennet and Mr. Tavilla prior to an attempted transfer to Mr. Hirsch.  Doc. 79, ¶ 35.  But to the extent the notes also reflect personal knowledge of what was said in the conversations Hirsch and Bennet had with Mr. Tavilla, Plaintiffs have failed to show that they could not be admitted under Rules 901 or 803(6).  What is more, Plaintiffs themselves include Cephalon's call center and legal department notes as an attachment to their own statement of facts (*see* Doc. 80-6 at 82-91) and cite to the notes repeatedly in support of their arguments that Cephalon withheld material information from Mr. Tavilla.  *See* Doc. 78 at 2, 7 (referring to Ex. H-1-H-4).  By failing to show precisely why the notes would be inadmissible, and by relying on the same notes themselves, Plaintiffs have failed to provide any basis upon which the Court should disregard the notes in ruling on this motion.

including acute and chronic mouth infections . . . [Y]our argument is that your teeth have deteriorated from your prolonged use of fentanyl lozenges."   Docs. 75 at 5; 76, ¶ 50, admitted with unrelated objections in Doc. 79, ¶ 50.

Deposition testimony for this case is in accord.  Mr. Tavilla testified that he knew Actiq was causing problems with his teeth before he saw Dr. Poulos in 2007 and that there was "no doubt" that he was dependent on Actiq when his wife and children began begging him to get off it prior to his daughter's birthday in September 2008.  Docs. 75 at 8; 76, ¶¶ 28, 31; admitted in Doc. 79, ¶¶ 28, 31.  Donna Tavilla likewise stated that she came to believe her husband was addicted to Actiq shortly after he began using it in 2005, that Dr. Poulos told her and Mr. Tavilla that Actiq was hurting his teeth in 2007, that their daughter Britny requested that Mr. Tavilla get off Actiq as a birthday present to her on September 5, 2008, that the family believed him to be "too dependent" on Actiq by then, and that she "hated seeing those little sticks sticking out of his face."  Docs. 75 at 9; 76, ¶¶ 26, 29, 30, admitted in Doc. 79, ¶¶ 26, 29, 30.

In sum, the undisputed facts show that Plaintiffs were aware of Mr. Tavilla's addiction to and injuries caused by Actiq as early as 2005, but at least by April of 2007, and, in the case of Britny Tavilla, at least prior to her birthday on September 5, 2008.  Under Arizona law, the cause of action therefore accrued and the statute of limitations began to run more than two years before Plaintiffs filed suit on September 15, 2010.  Plaintiffs cite no authority showing that claims for Mr. Tavilla's theoretically separable damages after September 15, 2008 are exempt from the limitations period that began to run at the time some injury had occurred and Plaintiffs' cause of action against Cephalon was known.[3]  Noting that "[t]he limitations period begins to run upon accrual" (*Doe*, 955

---

[3] Plaintiffs make an unclear argument regarding when a cause of action accrues on the basis of *Gust*.  Doc. 78 at 3-4.  Plaintiffs assert that Cephalon inaccurately cites *Gust*, and that the complete citation from *Gust* states, "the point is not when the last act upon which legal action is based took place . . . ."  *Id.* at 4.  In fact, *Gust* made no such statement; nor would a statement discounting the relevance of when the "last act" took place support Plaintiffs' position, which appears to date accrual from the time Mr. Tavilla last used Actiq rather than from the time some injury from Actiq took place or was discovered.  *Gust* noted that the traditional construction of the statute of limitations was

P.2d at 963), the Court finds that absent grounds for tolling, the statute of limitations bars Plaintiffs' claims.

Plaintiffs make no argument for the tolling of Donna and Britny Tavilla's claims. The Court accordingly will grant summary judgment to Cephalon as to these Plaintiffs. Plaintiffs also make no argument for tolling the claims brought on behalf of the Tavilla's minor children. Under A.R.S. § 12-502, if a Plaintiff is under eighteen years of age at the time the cause of action accrues, the statute of limitations is tolled until the removal of that "disability." Ariz. Rev. S. § 12-502. Because the limitations period has not yet commenced for the minor children, the Court will not dismiss these claims.

### B.    Plaintiffs' "Unsound Mind" Defense.

#### 1.    Legal Standard.

If a person is of unsound mind when a cause of action accrues, the statute of limitations is tolled for the period of disability. Ariz. Rev. S. § 12-502. This rule arises from the equitable principle that "it is unfair to bar an action in which the plaintiff is mentally disabled and thus unable to appreciate *or pursue* his or her legal rights." *Doe*, 955 P.2d at 963 (emphasis in original) (internal citations omitted). "In Arizona, unsound mind occurs when the 'person is unable to manage his affairs or to understand his legal rights or liabilities.'" *Id.* (quoting *Allen v. Powell's Int'l, Inc.*, 518 P.2d 588, 589 (Ariz. Ct. App. 1974)). Plaintiff bears the burden of "set[ting] forth specific facts – hard evidence – supporting the conclusion of unsound mind." *Doe*, 955 P.3d at 964.

#### 2.    Plaintiffs' Evidence of "Unsound Mind."

Plaintiffs argue that the declaration of Donna Tavilla provides hard evidence that

---

for the statutory period to run "when the act upon which legal action is based took place, even though the plaintiff may be unaware of the facts underlying his or her claim." 898 P.2d at 966. The court then discussed Arizona's application of the alternative and more generous "discovery rule," in which a cause of action accrues only when a plaintiff knows or has reason to know of the facts underlying the cause. *Id.* It is not clear how Plaintiffs believe *Gust* supports the position they appear to argue – that a new cause of action accrues for theoretically separable damages (in this case, brought about by Mr. Tavilla's continued use of Actiq) even where a plaintiff previously knew or should have known the facts giving rise to the injury. *See* Doc. 78 at 4. *See, e.g., Doe*, 955 P.2d at 963, ("[t]he limitations period begins to run upon accrual.").

Mr. Tavilla was of unsound mind before 2007 as a result of Actiq and other opioids he was taking for pain.  Doc. 78 at 6.  Plaintiffs cite specifically only to evidence showing that Mr. Tavilla did not want to be placed under guardianship and that his use of Actiq lasted until the spring of 2009.  *Id.*, citing Doc. 80-7, ¶¶ 6, 19.   Donna Tavilla's declaration also states that while Mr. Tavilla was on Actiq "he spent most of his time in bed and was unable to take care of his personal hygiene, do anything around the house, work to earn money, maintain vehicles, discipline the children, manage money, engage in any hobbies, have any kind of relationship[s]," and that getting Mr. Tavilla to his doctor's appointments required starting the previous day just to get him "cleaned up and out of the house."  *Id.*  The declaration states that Mr. Tavilla had hallucinations, spoke to people who were not there (*Id.*, ¶ 5), refused to sign paperwork for the Tavilla's *One Beacon* settlement to allow the money to be deposited or distributed (*Id.*, ¶ 12), and could not make decisions.  *Id.*, ¶ 15.

Plaintiffs also refer, without specific citations, to Exhibits AA-FF "in their entirety."  Doc. 78 at 6.  The Court will limit its discussion to the two citations Plaintiffs make to specific evidence.[4]  The Declaration of Michael Sucher, M.D. indicates that Dr. Sucher made a report on August 14, 2011, in which he stated,

> Given the dosage of opiate narcotics (in addition to other medications he was taking that affect the central nervous system function) that Mr. Tavilla was consuming during time he was on Actiq and the addictive behavior identified in Dr. Barnes' medical records (as well as pharmacy records) . . . [It is] my opinion that Mr. Tavilla was unable to manage his affairs and/or to appreciate and pursue his legal rights.

Doc. 80-7 at 9, Ex. AA, ¶ 31.

The Declaration of Plaintiffs' attorney, Richard T. Treon, states,

> Based upon . . . personal periodic observations of Mr. Tavilla during the time period January, 2006 through the Spring of 2009, Mr. Tavilla was not

---

[4] Plaintiffs bear the burden of finding and presenting evidence in the record.  As the Ninth Circuit has made clear, a "district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found."  *Carmen v. S.F. Unified Sch. Dist.,* 237 F.3d 1026, 1031 (9th Cir.2001).

1
2
3

    mentally competent to manage his daily affairs nor did he understand his legal rights and liabilities.  All of the decisions that were made during that time period regarding Mr. Tavilla's affairs were made by his wife or made by me within the scope and authority previously vested in me . . ., and the authority was given me prior to the time he became mentally incompetent.

4  Doc. 80-7, ¶ 17.  The declaration goes on to describe Mr. Tavilla as bed-ridden and

5  unable to use the bathroom.  *Id.*  Mr. Treon describes going to the Tavilla's home and

6  having to speak to Mr. Tavilla through a window to his bedroom because Mr. Tavilla

7  would not let him enter and because he was physically incapable of getting out of bed,

8  "having ballooned up to approximately 500 pounds and being sleepy because of drugs."

9  *Id.*  Mr. Treon further states that Mr. Tavilla "seemed disoriented to time and place; and,

10  most importantly, Mr. Tavilla's mind had disassociated from reality."  *Id.*  He describes

11  Mr. Tavilla as seeing ghosts, believing his neighbor to be a witch, and believing that his

12  wife, psychologist, and Mr. Treon were plotting to have him committed to a mental

13  institution.  *Id.*  Mr. Treon states that they did not seek to have Mr. Tavilla committed

14  because of his extreme anger and threats evoked by this suggestion.  *Id.* at ¶ 19.

15      Although this evidence does not precisely define the onset, constancy, and

16  duration of Mr. Tavilla's mental difficulties, taken in a light most favorable to the non-

17  moving party, the Court finds that a jury could reasonably conclude that Mr. Tavilla was

18  not competent to manage his daily affairs or pursue his legal rights from the time his

19  injury became known until early 2009.

20      **3.**    **Cephalon's Judicial Estoppel Argument.**

21      Judicial estoppel "precludes a party from gaining an advantage by taking one

22  position [in the judicial process], and then seeking a second advantage by taking an

23  incompatible position."  *Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597,

24  600 (9th Cir. 1996).  This doctrine is intended to protect the dignity of the judicial

25  process and to keep litigants from "playing fast and loose with the courts."  *Russell v.*

26  *Rolfs*, 893 F.2d 1033, 1027 (9th Cir. 1990) (quoted in *Rissetto*, 94 F.3d at 601).  It is an

27  equitable doctrine to be invoked at the courts' discretion.  *Id.* In determining whether to

28  apply judicial estoppel, courts must look to the following factors:

(1) whether the party's later position is "clearly inconsistent" with its earlier position;

(2) whether the party has successfully advanced the earlier position, such that judicial acceptance of an inconsistent position in the later proceeding would create a perception that either the first or the second court had been misled; and

(3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Samson v. NAMA Holdings, LLC*, 637 F.3d 915, 935 (9th Cir. 2011) (internal quotation marks and citations omitted).

Cephalon argues that Plaintiff is judicially estopped from claiming he was of unsound mind because he participated in and benefitted from at least four other lawsuits from 2004 to 2008 and thus held himself out as competent to pursue his legal claims. Doc. 75 at 10-13. These actions include: (1) *Tavilla v. Endocrinology* (filing suit in 2007, giving deposition testimony and signing medical release forms in 2008), (2) *Tavilla v. One Beacon* (giving deposition testimony in 2006, signing a settlement agreement in January 2008), (3) *Tavilla v. City of Phoenix* (giving deposition testimony in May 2005 and October 2009, and trial testimony in November 2009 ), and (4) *Tavilla v. City of Phoenix* (taking part in mediation and settlement on behalf of the Tavilla children in February 2005). *Id.*

Plaintiffs respond that judicial estoppel does not bar Mr. Tavilla from claiming incompetence for the purpose of filing this action because he did not participate significantly in any of the four lawsuits for which Cephalon alleges he held himself out as competent. *Id.* at 10-15. Plaintiffs assert that *Tavilla v. Endocrinology* was a slip and fall case based on an injury Mr. Tavilla sustained in February of 2005, shortly after he started taking Actiq. *Id.* at 10. Plaintiffs argue that Mr. Tavilla's addiction at that time did not yet prevent him from relating facts to a paralegal, that Mr. Tavilla had nothing to do with the actual filing by his attorney in 2007 (*see* Doc. 80-7, ¶ 14), and that the case settled in January 2010, long after Mr. Tavilla was free from the effects of Actiq. *Id.*, *Id.* at 12; *see* Doc. 76, ¶ 59. Plaintiffs also discount Mr. Tavilla's signing of medical release forms

presented to him and his ability to answer questions at deposition. *Id.* at 77-78. Plaintiffs cite to Dr. Sucher's report stating that a person impaired by excessive use of narcotics can answer questions put to him or have periods of lucidity without being mentally competent to understand his legal rights or manage day-to-day affairs. *Id.* citing, Doc. 80-7, ¶¶ 40-42.

Plaintiffs argue that Mr. Tavilla had nothing to do with the processing of *Tavilla v. One Beacon* after that case was filed in 2001 and re-filed in 2003. *Id.* at 11. Plaintiffs do not deny that Mr. Tavilla gave a deposition on February 13, 2006. *Id., see* Docs. 76, ¶ 62; 79, ¶ 62. But Plaintiffs present evidence from the declaration of Mr. Treon stating that the case languished because of Mr. Tavilla's mental and physical impairment, that when Mr. Tavilla attended arbitration in January 2008 he did so "propped in a corner" and "almost passed out," he had to be placed in a bed in an adjoining room, and when the case finally settled due to Donna Tavilla's agreement with Mr. Treon, Mr. Tavilla refused to sign papers to distribute the money. *Id.*, Doc. 80-7, ¶¶ 16, 21.

Plaintiffs argue that the settlement agreement Mr. Tavilla signed following mediation on February 22, 2005 in *Tavilla v. City of Phoenix* actually shows that he acted incompetently because the since-nullified agreement included a claims release that his attorney had directed him not to sign and Mr. Tavilla "simply signed what the City's lawyer put in front of him." Docs. 78 at 11; 80-7, ¶ 15. Plaintiffs state that this settlement still has not been completed. Doc. 78 at 11.

Finally, Plaintiffs argue that *Tavilla v. City of Phoenix* (sexual harassment of Mrs. Tavilla) does not show that Mr. Tavilla held himself out as competent during the period he was taking Actiq because Mr. Tavilla's own cause of action was dismissed in 2003, prior to taking Actiq, and the deposition testimony he gave in May 2005 and October 16, 2009 occurred either before he suffered any injury to his teeth or after he detoxed and no longer was incompetent. *Id.* at 11-12.

The Court is not persuaded that judicial estoppel bars Mr. Tavilla from claiming unsound mind in this case. Cephalon has not cited explicit assertions by Mr. Tavilla in

these earlier cases, or findings by the courts in these cases, that are "clearly inconsistent" with his position in this case.  With no clearly inconsistent prior positions, the Court is not persuaded that acceptance of Mr. Tavilla's incompetency for tolling purposes in this case would create the perception that this Court or the earlier courts have been misled.

Moreover, while it may generally be true that an incompetent person "cannot bring or defend a legal proceeding in person" (*see Kiley v. Jennings, Strouss & Salmon*, 927 P.2d 796, 800 (Ariz. Ct. App. 1996)), Plaintiffs have raised issues of fact about whether and to what extent Mr. Tavilla actually brought or guided the earlier proceedings. Plaintiffs dispute that Mr. Tavilla filed any lawsuits during the relevant time-period, pointing to the declaration of Mr. Treon which states that Mr. Tavilla had no involvement in the filing of *Tavilla v. Endocrinology*, the only suit filed while Mr. Tavilla was taking Actiq.  Plaintiffs also point to evidence that *One Beacon*, the only settlement Mr. Tavilla entered into after February 2005 and before January 2010, was settled by his wife and attorney following an arbitration in which Mr. Tavilla did not meaningfully participate. Mr. Tavilla's consent in signing that settlement at the behest of his wife and attorney does not constitute prior judicial acceptance of his competency.

In short, the Court cannot conclude as a matter of undisputed fact that the doctrine of judicial estoppel applies.   The Court therefore cannot base a grant of summary judgment on that doctrine.

### 4.    Cephalon's Competency Argument.

Cephalon argues that even if judicial estoppel does not apply, Plaintiffs have not met their burden of showing incompetency for purposes of equitable tolling because Mr. Tavilla's actions during the time he claims incompetence demonstrate a "complete ability to gain 'access to courts' and to 'participate in, control, or understand progression of suit.'"   Doc. 75 at 13, quoting from *Doe*, 955 P.2d at 964.  In addition to Mr. Tavilla's participation in the above-cited cases, Cephalon refers to Mr. Tavilla's pursuit of claims against BCBS, beginning in 2007, and his communications with Cephalon at the same time, seeking compensation for his dental injuries.  Doc. 75 at 14-17.

The undisputed facts show that on May 1, 2007, Mr. Tavilla contacted BCBS to request coverage for dental work performed by Dr. Poulos as well as for future treatment. Doc. 76, ¶ 42, admitted in Doc. 79, ¶ 42.  Dr. Poulos also submitted a letter on Mr. Tavilla's behalf to BCBS attesting to Mr. Tavilla's severe dental breakdown and requesting permission to begin treatment.  Doc. 76, ¶ 43, admitted with additions in Doc. 79, ¶ 43. On June 25, 2007, Mr. Tavilla called BCBS to check on the status of his claim.  Doc. 76, ¶ 45; denied as to conclusions made but not as to content of BCBS citations in Doc. 79, ¶ 45.  Notes from this conversation, to which Plaintiffs have not objected, show that Mr. Tavilla explained that his medication was causing his injuries and that he would need to take legal action if this matter was not resolved.  *See* Doc. 76-4 at 259 (BCBS0006, 06/25/07).  On August 23, 2007, Mr. Tavilla called to inquire about the denial of his claim (Doc. 76, ¶ 46, accord Doc. 79, ¶ 46), and on August 31, BCBS sent a letter to Mr. Tavilla confirming its denial and informing him of his right to submit a written grievance (Doc. 76-4 at 263 (BCBS0454)).  BCBS sent two more letters, the first on September 21, 2007, explaining its denial in more detail and explaining Mr. Tavilla's rights to a third review, and the second on October 22, 2007, discussing its review and offering a compromise of limited coverage.  *See* Doc. 76-4 at 263-64; 268-71.

The record also shows that the Tavillas retained Mr. Treon to represent them in regard to their claims against BCBS and that Mr. Treon contacted BCBS on August 26, 2008 in an attempt to secure coverage.  Doc. 76, ¶ 51.  The Tavillas initiated a lawsuit against BCBS on August 4, 2009.  *Id.*, ¶ 52.  Plaintiffs deny that the Tavillas retained Mr. Treon solely for this coverage dispute, stating they "retained Mr. Treon to represent them in regard to their claims against BCBS, not just regarding a "coverage dispute."  Doc. 79, ¶ 51.  A review of the complaint shows that the Tavillas made claims against BCBS both because it paid for Mr. Tavilla's prescription to an addictive, off-label drug that was injurious to his health and because it refused to pay for necessary dental expenses, issues related both substantively and temporally to Mr. Tavilla's use of Actiq.  *See* Doc. 76-4 at 298-299, ¶¶ 5-6.

The record also shows that Mr. Tavilla contacted Cephalon on April 17, 2007, seeking compensation for his dental injuries.  Doc. 76, ¶¶ 33-34.  Mr. Tavilla requested contact from Cephalon's legal department and asked that Cephalon "do the right thing" so that he would not have to hire a lawyer and sue.  Doc. 76-4 at 242, Tavilla-000002.  Mr. Tavilla later spoke to in-house attorney Brian Hirsch and told him he could provide pharmacy, medical, and dental records and that he wanted Cephalon to compensate him for "reasonable pain and suffering."  Doc. 76-4 at 247-48, Tavilla-000025-26.  He also stated that he had a lawyer, Richard Treon, but he had not yet hired him to help with this matter.  *Id.*  Mr. Tavilla contacted Cephalon four more times from May to November of 2007, during which time he continued to ask for compensation or "advances" for his dental treatment, but he never sent records to establish his claim.  Doc. 76, ¶¶ 36, 38.

Cephalon argues that Mr. Tavilla's pursuit of coverage from BCBS demonstrates that he was capable of managing his affairs and pursuing his legal rights with respect to Actiq.  Doc. 75 at 15.  Cephalon points in particular to Mr. Tavilla's avowals to BCBS that he would pursue legal action if his claims were not resolved, the fact that he pursued his claims through three levels of review, and the fact that Mr. Tavilla eventually filed suit within the appropriate statute of limitations.  Cephalon also argues that Mr. Tavilla's direct contact with Cephalon representatives shows that

> Mr. Tavilla possessed the mental acuity and wherewithal to (a) secure the identity of Actiq's manufacturer, Cephalon; (b) locate a telephone number for Cephalon's medical information call center; (c) contact the call center; and (d) thereafter engage in repeated telephone calls with Cephalon representatives in an effort to secure compensation.

*Id.* at 16.

Cephalon asserts that the Arizona District Court's analysis in *Cecala* applies in this case.  Doc. 75 at 16.  In *Cecala*, the court held that Plaintiff Cecala had not met the unsound mind exception to Arizona's statute of limitations for purposes of withstanding summary judgment on her intentional infliction of emotional distress and breach of fiduciary duty claims.  532 F.Supp.2d at 1153.  The court found that Cecala had not

shown an inability to understand her legal rights because she made multiple attempts to secure counsel during the time of her alleged incompetence; she used a lawyer-locator service and discussed her claims with a prospective attorney; she conducted independent legal research; and when she failed to secure counsel, the transcript from her arbitration proceeding shows that she prosecuted her claims on her own. *Id.* at 1146-47.  The court concluded that Cecala submitted no hard evidence that would create a genuine issue of fact as to her understanding of her legal rights.  *Id.* at 1147.

The court also found that expert affidavits and the declarations of family and friends failed to show that Cecala was unable to manage daily affairs.   The court determined that the expert opinions provided only "bare medical conclusions" without "specific facts" or "hard evidence" supporting functional incapacity or pertinent time periods.  *Id.* at 1148-49.  The declarations of family and friends also showed that Cecala was "deeply troubled" and that she had difficulty performing daily tasks due to her fragile psychological state, but they did not create a triable issue of fact as to whether she was "simply incapable of carrying on the day-to-day affairs of human existence."  *Id.* at 1149, quoting *Florez v. Sargeant*, 917 P.2d 250, 255 (Ariz. 1996).   By her own admission, Cecala was able to do such things as shop, schedule and keep appointments for personal grooming and medical care, and make airline reservations.  552 F. Supp.2d. at 1150.  Upon complete review of the evidence, the court concluded that

> at the relevant times [Cecala] actually did the ultimate thing the unsound mind exception aims to prove she could not do: pursue litigation. She prosecuted, directly and later with counsel, the Nations Bank arbitration and litigation. She conferred with counsel, researched, and prepared litigation against Newman. She now asks the court to allow a jury to find that she could not do the very thing she was doing. This defiance of plain facts and plain meaning would make foolery of the unsound mind exception.

*Id.* at 1152-53.

Cephalon argues that these same determinations should apply in Mr. Tavilla's case because throughout the period in question he pursued litigation and, like the plaintiff in *Cecala*, his attempt to seek coverage from BCBS for Actiq-related claims, culminating in

- 16 -

filing a lawsuit, shows that he was able to do "the very thing" he wants a jury to find he could not do.  Doc. 75 at 17.

**5.      Analysis.**

As previously stated, being of unsound mind means a person is "unable to manage his daily affairs or to understand his legal rights or liabilities."  *Doe*, 955 P.2d at 966.  The definition is in the disjunctive – a plaintiff may be of unsound mind if either of these conditions exists.  The Court must consider both alternatives.  *Cecala*, 532 F.Supp.2d at 1144, citing *Doe*, 955 P.2d at 966.

Plaintiffs have not established a genuine dispute of fact as to whether Mr. Tavilla was unable to understand his legal rights.   The uncontroverted evidence of his conversations with BCBS and Cephalon seeking compensation for his Actiq-related injuries, coupled with his threats to take legal action, leave little doubt that Mr. Tavilla understood his legal rights.  Because the record shows that he was familiar with litigation, took actions aimed at getting compensation for his Actiq-related claims, and has "submitted no hard evidence of denial or inability to articulate [the] wrongs perpetrated [in this case]" (*see Cecala*, 552 F.Supp.2d at 1148), the Court concludes that Plaintiffs have failed to create an issue of material fact on his understanding of legal rights.

The same is not true, however, for his ability to manage his day-to-day affairs.  Plaintiffs have presented evidence through the declarations of Donna Tavilla and Richard Treon that Mr. Tavilla was unable to get out of bed, go to the bathroom, care for his personal hygiene, or attend medical appointments on his own.  They attest that he was not capable of making decisions or directing his personal affairs.  To be sure, Cephalon's evidence of his participation in other litigation and his repeated phone calls to BCBS and Cephalon provides a potent basis for questioning these assertions – one that may well convince a jury that Mr. Tavilla was more capable than Plaintiffs contend – but this is precisely the kind of factual issue that precludes summary judgment.

"In the context of determining unsound mind as evidenced by an inability to manage daily affairs, the question is whether there is *credible evidence* of the plaintiff's

*inability* to manage daily affairs." *Doe*, 955 P.2d at 965 (emphasis in original).  Where, as here, the plaintiff has produced such evidence, he "is not required to discredit all evidence of ability to manage [his] affairs – such controverting evidence merely establishes that there is a jury question on an issue of material fact." *Id.*  Because it is the role of the jury, and not the Court, "to weigh conflicting evidence to determine whether the plaintiff was capable of functioning on a day-to-day basis" (*id.*), summary judgment must be denied.[5]

## IV.   Plaintiffs' Motions.

### A.   Motion to Strike.

Plaintiffs filed a motion to strike Cephalon's statement of additional facts filed with its reply.  Doc. 84; *see* Docs. 81-82.  Plaintiffs argue that no procedural rule supports the filing of additional facts and that if the Court accepts Cephalon's additional facts and exhibits it should also accept further clarifications and additions from Plaintiffs.  Doc. 84 at 2.  The Court has reviewed Cephalon's additional statement of facts and attachments and finds that they do not affect its analysis.  The Court has not relied on any of the challenged facts and therefore will deny Defendants' motion as moot.

### B.   Motion to Amend Complaint.

Plaintiffs filed a motion to amend their complaint, seeking to add causes of action for common law fraud and consumer fraud arising from six telephone calls between Mr. Tavilla and Cephalon from April 17 to November 2, 2011.  Doc. 85 at 2.  Plaintiffs allege

---

[5] Plaintiffs assert three alternative, substantively indistinct and interdependent theories for why the statute of limitations should be tolled: (1) Cephalon is estopped from invoking the statute of limitations because Cephalon's in-house counsel, Brian Hirsch, negligently failed to tell Plaintiff in three phone calls in 2007 that as a non-cancer patient he should not be taking Actiq, (2) Cephalon committed fraud – again, through the omissions of Mr. Hirsch – and is therefore barred from raising a statute of limitations defense, and (3) the doctrine of equitable tolling applies, presumably because of the same alleged omissions/fraud of Mr. Hirsch.  Doc. 78 at 6-10.  Having concluded that a jury could reasonably conclude that Mr. Tavilla was not of sound mind from the time his cause of action accrued until at least two years prior to the time he filed, the Court need not address these alternative arguments.

that Cephalon representatives, including in-house counsel Brian Hirsch, failed to tell Mr. Tavilla numerous material facts that Cephalon had a duty to disclose in order to prevent Mr. Tavilla from suffering further damage from Actiq.  *Id.* at 2-3.

Cephalon argues that the Court should deny the motion to amend because Plaintiffs have failed to state claims for fraud or consumer fraud, and leave to amend would therefore be futile.  Doc. 87 at 2.

Rule 15 of the Federal Rules of Civil Procedure declares that courts should "freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  While "this mandate is to be heeded," leave to amend may be denied if the amendment would be futile.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  "A district court does not err in denying leave to amend where the amendment would be futile, . . . or where the amended complaint would be subject to dismissal."  *Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991) (citations omitted); *see Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988) ("A motion for leave to amend may be denied if it appears to be futile or legally insufficient.") (citation omitted).

### 1.   Common Law Fraud.

The requirements for proof of common law fraud in Arizona are "very strict" and require a showing of nine elements:

> (1) a representation; (2) its falsity; (3) its materiality; (4) speaker's knowledge of its falsity or ignorance of its truth; (5) intent that it should be acted upon; (6) hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon, and (9) his consequent and proximate injury.

*Fridenmaker v. Valley Nat. Bank of Arizona*, 534 P.2d 1064, 1068 (Ariz. Ct. App. 1975). "[F]ailure to prove any one of [these elements] is fatal to the cause of action."  *Id.*

Arizona follows the Restatement (Second) of Torts.  *Jesik v. Maricopa Cnty. Cmty. Coll. Dist.*, 611 P.2d 547, 550 (Ariz. 1980).  Under the Restatement, fraud can be based on a misrepresentation of fact.  Restatement (Second) of Torts § 525 (1938).  A party may also be liable for fraud through failure to disclose, but only if that party is

under a duty to disclose. *Id.* at § 551(1). Alternatively, a party may be liable for fraudulent concealment even where there is no duty to disclose, but only if that party "intentionally prevents the other from acquiring material information." *Id.* at § 551(1). Fraudulent concealment differs from mere silence and must involve "deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter." *Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 35 (Ariz. 2002) (quoting *United States v. Colton*, 231 F.3d 890, 899 (4th Cir. 2000) (internal quotation marks omitted)).

Thus, to state a claim for common law fraud, Plaintiffs must allege facts upon which the Court could reasonably infer either that Mr. Hirsch and other Cephalon representatives misrepresented material facts, violated an affirmative duty to disclose, or intentionally concealed information to hide or prevent further inquiry by Mr. Tavilla into material facts related to his injuries and right to seek compensation. This claim must be plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Plaintiffs' proposed amended complaint alleges that Mr. Tavilla called Cephalon's call center on April 17, 2007, described his reasons for taking Actiq and his dental issues, and asked for compensation. Doc. 85-2, ¶¶ 33-38. The complaint alleges that Cephalon representatives failed to ask Mr. Tavilla if he was a cancer patient or to report his medical issues to the FDA as an "adverse event" as required by FDA rules and regulations. *Id.*, ¶¶ 40-42. It also alleges that Cephalon representatives failed to ask Mr. Tavilla about the dosages he was taking, speak to him about following an "overdose" regimen, or ask for information about the pharmacy supplying the Actiq. *Id.*, ¶¶ 42, 47. It further alleges that Cephalon switched Mr. Tavilla's calls from the "medical track" to the legal department "in order to avoid telling him critically important medical information." *Id.* ¶ 48.

The proposed amended complaint makes several allegations specific to Mr. Hirsch. It alleges that Mr. Hirsch intentionally failed to ask Mr. Tavilla if he had cancer (*id.*, ¶¶ 53, 56) and otherwise failed to advise him that his use of Actiq constituted "off-label use" (*id.*, ¶ 64, 65). Plaintiffs allege that Cephalon had an agreement with the FDA to contact any physician it knew was prescribing Actiq for off-label purposes (*id.*, ¶ 66), that Cephalon intentionally failed to find out who was prescribing Actiq for Mr. Tavilla (*id.*, ¶ 67), and that Mr. Hirsch should have known that Mr. Tavilla was not competent to produce his medical records for processing his claim and therefore had a duty to contact Mr. Tavilla's doctor or lawyer to inform them of Mr. Tavilla's addiction and dental issues. *Id.*, ¶76.

Plaintiffs also allege that Mr. Hirsch knew, but did not inform Mr. Tavilla, that 36 others had contacted Cephalon regarding dental problems associated with the use of Actiq and that at least one lawsuit had been filed (*id.*, ¶¶ 51, 55), that Cephalon had been subject to investigation by the United States Attorney's Office ("USAO") and the Department of Justice ("DOJ") for sales and promotional practices related to off-label use of Actiq (*id.*, ¶ 57), and that Cephalon had been accused by state and federal agencies of Medicare/Medicaid fraud related to "off-label" use. *Id.*, ¶ 60. It also alleges that Mr. Hirsch intentionally neglected to tell Mr. Tavilla that Cephalon would use information from these calls to support a statute of limitations defense. *Id.*, ¶ 63.

With respect to the dangers of taking Actiq, Cephalon asserts that it only has a duty to inform prescribing physicians, not their patients, of the known risks associated with the use of its pharmaceuticals. Doc. 87 at 6. Cephalon argues that its representatives nonetheless referred Mr. Tavilla to product information regarding the risks of addiction and tooth decay associated with Actiq and that Mr. Tavilla acknowledged familiarity with this information. *Id.* Additionally, Mr. Tavilla had been told by his own healthcare providers that Actiq was the cause of his injuries, and, Cephalon argues, there was no reason to tell him what he already knew. Nor could Mr. Tavilla have reasonably relied on Cephalon's alleged omissions of material facts when no

one attempted to dissuade him from his belief that Actiq had caused his injuries or to keep him from taking actions to pursue a claim.  *Id.* at 6-7, 8.  Cephalon also argues that it had no duty to inform Mr. Tavilla's health care providers and lawyer of his calls (*id.* at 7, n. 4) or to inform Mr. Tavilla of FDA regulatory requirements and investigations into its marketing practices, particularly where this information was not material to the purpose of Mr. Tavilla's calls – to demand compensation for his personal injuries.  Doc. 87 at 8-9.

To the extent Plaintiffs' claim rests on Cephalon's failure to disclose Actiq's intended use and possible side effects, the Court agrees that Plaintiffs have not shown that Cephalon had an affirmative duty to warn Mr. Tavilla about using Actiq when he was under the care of a prescribing physician who had relevant product information.  *See Dyer v. Best Pharmacal*, 577 P.2d 1084, 1087 (Ariz. Ct. App. 1978) ("A drug manufacturer has discharged his duty to the public if he has properly warned the administrating physician of contraindications and possible side effects of the drug.").

Plaintiffs have also failed to allege facts showing that Cephalon intentionally concealed material facts about the dangers of taking Actiq.  Given the fact that Mr. Tavilla overtly sought compensation for his Actiq-related dental issues, repeatedly expressing his belief that Actiq caused his injuries (*see, e.g.*, *id.* at 244, Tavilla-000004) and that Cephalon was "responsible for" his teeth and mouth problems (*id.* at 247, Tavilla-000026), the Court finds it implausible that any alleged non-statements on the part of Cephalon representatives were intended to hide information about the known risks of taking Actiq.  It is also implausible to infer that Cephalon took actions calculated to prevent further inquiry into the matter where the record shows that a Cephalon representative "discussed [the] section on Patient Counseling/Dental care" with Mr. Tavilla (Doc. 76-4 at 242, Tavilla-000002), and Mr. Tavilla later showed familiarity with the product warning when he told Mr. Hirsch that he believed it was "aimed at terminal people who don't care about the harm" (*id.* at 248, Tavilla-000026).  Additionally, the record shows that Cephalon representatives forwarded Mr. Tavilla's calls to the legal

department as he requested, instructed him to send a written request for compensation, and repeatedly asked him to send medical, dental, and pharmacy records to support his claim.  *See id.* at 244, Tavilla-000004; 247-252, Tavilla-000025-29.  To the extent Plaintiffs allege that Cephalon failed to comply with FDA regulations and specific reporting requirements, this also does not support a claim that Cephalon concealed material information from Mr. Tavilla.

With respect to Mr. Hirsch's alleged failure to inform Mr. Tavilla of other pending lawsuits and investigations or to inform him of the statute of limitations considerations for filing a tort action, the Court finds that Plaintiffs have failed to allege facts showing that Mr. Hirsch or any other Cephalon representatives had a duty to inform Mr. Tavilla of these matters.  Nor do Plaintiffs allege facts showing that Mr. Hirsch or other Cephalon representatives took actions to conceal or hide this information.  The proposed amended complaint alleges no facts showing that Mr. Tavilla inquired into these matters or that Mr. Hirsch intentionally steered him away from such information.  Plaintiffs have also not shown how Cephalon's failure to contact Mr. Tavilla's doctor or lawyer about his injury and potential claims, even if required, constitutes a failure to disclose or the concealment of material facts from Mr. Tavilla, particularly where Mr. Tavilla already knew the cause of his injuries and had been informed of what he needed to do to seek compensation from Cephalon.

The Court concludes that Plaintiffs have failed to make a plausible claim that Cephalon made false representations of material facts to Mr. Tavilla, either overtly or by the omission of facts it had a duty to disclose.  The facts alleged in the proposed amended complaint also do not lead to the reasonable inference that Cephalon concealed or "intentionally prevent[ed Mr. Tavilla] from acquiring material information." Restatement (Second) of Torts § 551(1).  This failure to show a false representation is fatal to Plaintiffs proposed common law fraud claim.

**2.    Consumer Fraud.**

Arizona's Consumer Fraud Act ("CFA") defines fraud as

> [t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission . . . .

Ariz. Rev. S. § 44-1522.  Generally stated, claims under the CFA, like common law fraud claims, can be based on affirmative misrepresentations, concealment, or omission of material facts.  To the extent that "omission" suggests that mere silence as to material facts may be actionable without a duty to disclose, the Arizona Court of Appeals has rejected this interpretation.  *See Horne v. AutoZone Inc.*, 258 P.3d 289, 299 (Ariz. Ct. App. 2011) (finding that a CFA claim, like a common law fraud claim, can be based on omission only "when the law imposes a duty to disclose.").  Thus, Plaintiffs' failure to allege facts plausibly showing misrepresentation, concealment, or failure to disclose in support of their common law fraud claim is also fatal to their consumer fraud claim.

Having determined that Plaintiffs have failed to state a claim for common law fraud or consumer fraud, the Court concludes that granting Plaintiffs leave to file the proposed amended complaint would be futile.

**IT IS ORDERED:**

1.      Defendant Cephalon's Motion for Summary Judgment (Doc. 75) is **granted** with respect to Plaintiffs Donna and Britny Tavilla.

2.      Defendant Cephalon's Motion for Summary Judgment (Doc. 75) is **denied** with respect to the Tavilla's minor children and Nicolai Tavilla.

3.      Plaintiffs' Motion to Strike (Doc. 84) is **denied** as moot.

4.      Plaintiffs' Motion to File an Amended Complaint (Doc. 85) is **denied**.

5.      The Court will set a second case management conference by separate order.

Dated this 3rd day of May, 2012.

_____
David G. Campbell
United States District Judge